22-CV-0003 (JPC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH SROUR,

                                        Plaintiff,

              v.

NEW YORK CITY, New York,
KEECHANT SEWELL, in her Official
Capacity as NYPD Police Commissioner,

                                        Defendants.

**DEFENDANTS CITY OF NEW YORK AND COMMISSIONER KEECHANT SEWELL'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

*HON. SYLVIA O. HINDS-RADIX*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Aimee Lulich*
*Tel:  (212) 356-2369*
*Matter No.:*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

STANDARD OF REVIEW ................................................................................................. 5

ARGUMENT

        I.    Plaintiff's Attempts to Raise Arguments of As-Applied Constitutional Violations or Pre-emption Must Fail Because These Claims Were Withdrawn ........................................................................................ 6

        II.    Plaintiff Cannot Meet His Burden to Demonstrate That the Challenged Provisions Are Facially Unconstitutional .............................................. 7

            A. Legal Standard for Facial Constitutional Challenges ............................................................................... 7

            B. Second Amendment Standard .......................................... 7

            C. The Challenged Regulations Are Not Facially Unconstitutional ................................................ 10

CONCLUSION ................................................................................................................. 19

Authorities

# TABLE OF AUTHORITIES

**Cases**                                                                                                        **Pages**

Ashwander v. TVA,
    297 U.S. 288, 346-47 (1936) .................................................................7

Celotex Corp. v. Catrett,
    477 U.S. 317, 322-23 (1986) .................................................................5

District of Columbia v. Heller,
    554 U.S. 570 (2008)...............................................7, 8, 9, 10, 11, 12, 13, 15

Drummond v. Robinson Twp.,
    9 F.4th 217, 228 n.8 (3d Cir. 2021) ......................................................15

Kanter v. Barr,
    919 F.3d 437, 458 (7th Cir. 2019) ........................................................14

McDonald v. Chicago,
    561 US. 742 (2010)...........................................................7, 10, 11, 12

Medina v. Whittaker,
    913 F.3d 152, 159 (D.C. Jan. 18, 2019)..................................................15

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &
    Explosives,
    700 F.3d 185, 200 (5th Cir. 2012) ........................................................14

New York State Rifle & Pistol Ass'n, Inc. v. Bruen,
    142 S. Ct. 2111 (2022)...........................................2, 7, 8-9, 10-13, 15

New York State Rifle & Pistol Ass'n v. Cuomo,
    804 F.3d 242, 265 (2d Cir. 2015).........................................................7

Quaratino v. Tiffany & Co.,
    71 F.3d 58, 64 (2d Cir. 1995)............................................................5, 6

Twin Laboratories, Inc. v. Weider Health & Fitness,
    900 F.2d 566, 568 (2d Cir. 1990).........................................................5

United States v. Gonzalez,
    2022 U.S. App. LEXIS 26532, *2 (7th Cir. Sept. 22, 2022) ...................................12

**Authorities**

United States v. Jimenez,
    Index No. 2016 U.S. Dist. LEXIS 73169, at *3-4 (S.D.N.Y. June 3, 2016) ............................7

United States v. King,
    No. 21-CR-0255 (NSR)
    2022 U.S. Dist. LEXIS 183586, *5 (S.D.N.Y. Oct. 6, 2022) ..................................................12

United States v. Rowson,
    No. 22-CR-0310 (PAE), 2023 U.S. Dist. LEXIS 13832,  *55 (S.D.N.Y. Jan.
    26, 2023) .................................................................................................................13, 15, 16

United States v. Salerno,
    481 U.S. 739, 745 (1987)..........................................................................................................7

United States v. Skoien,
    614 F.3d 638, 640 (7th Cir. 2010) ...................................................................................13, 18

Wash. State Grange v. Wash. State Republican Party,
    552 U.S. 442, 451 (2008)..........................................................................................................7

Waters v. State,
    1 Gill 302, 309 (MD. 1843) ....................................................................................................15

**New York City Laws and Rules**

Title 38 of the Rules of the City of New York § 3-03(a).........................................1, 3, 13, 16, 17

Title 38 of the Rules of the City of New York § 3-03(e).....................................................1, 17, 18

Title 38 of the Rules of the City of New York § 3-03(h) ......................................................1, 3, 13

Title 38 of the Rules of the City of New York § 3-03(n) ......................................................1, 3, 13

Title 38 of the Rules of the City of New York § 5-10(a).........................................1, 3, 13, 16, 17

Title 38 of the Rules of the City of New York § 5-10(e).....................................................1, 17, 18

Title 38 of the Rules of the City of New York § 5-10(h) ...................................................1, 3, 4, 5, 13

Title 38 of the Rules of the City of New York § 5-10(n) ......................................... 1, 4-5, 13, 18

New York City Administrative Code § 10-303(a)(2) ...............................................................1, 3

New York City Administrative Code § 10-303(a)(9) ...............................................................1, 3

New York City Administrative Code § 10-310 ........................................................... 1, 3, 12-13

**Authorities**

**Other Laws and Statutes**

Acts and Laws of His Majesty's Province of New-Hampshire, In New England:
with Sundry Acts of Parliament 1759 (1701) ...........................................................................15

Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay,
52-53 (1869) (1692)........................................................................................................................15

Statutes at Large of Pennsylvania from 1682 to 1801, pg. 23 (1896) (1700)................................15

Laws of the State of Delaware from the Fourteenth Day of October, One
Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand
Seven Hundred and Ninety-Seven 52 (1797) (1700)............................................................. 15-16

Acts and Laws of His Majesties Colony of Connecticut in New-England 91
(1901) (1702) ..................................................................................................................... 15-16

Statutes at Large; Being a Collection of All the Laws of Virginia, from the first
Session of the Legislature, in the Year 1619, pg. 41 (1823) (1789) .................................... 15-16

General Public Statutory Law and Public Local Law of the State of Maryland,
from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a
Copious Index (1840) ......................................................................................................... 15-16

**Other Authorities**

Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America*
115-16 & accompanying notes (2013).............................................................................. 14-15

Bernard Schwarz, *The Bill of Rights: A Documentary History* 662, 665 (1971)..........................13

Carina Bentata Gryting & Mark Anthony Frassetto, *NYSRPA v. Bruen and the
Future of the Sensitive Places Doctrine: Rejecting the Ahistorical
Government Security Approach*, 63 B.C. L. Rev. E. Supp. 60, 64 n.22 (2022) .......................9

Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing
Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 123 n. 11
(2015)................................................................................................................................................9

Joyce Lee Malcolm, *To Keep and Bear Arms* at 140-41 (1994) ...................................................14

**<u>Authorities</u>**

Robert H. Churchill, *Rethinking the Second Amendment:  Gun Regulation, the*
    *Police Power, and the Right to Keep Arms in Early America:  The Legal*
    *Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007)............................11, 14

Samuel Cornell, *A Well Regulated Right: The Early American Origins of Gun*
    *Control*, 73 FORDHAM L. REV. 487, 506-07 (2004)........................................................... 14-15

Saul Cornell, "*Don't Know Much About History": The Current Crisis in Second*
    *Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002)................................................14

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American*
*Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004)................................................14

Robert J. Spitzer, Gun Law History in the United States and Second Amendment
    Rights, 80 L. & CONTEMPORARY PROBS. 55, 72 & nn.103-04 (2017)............................. 14-15

William Rawle, *A View of the Constitution of the United States of America* 126
    (2d ed. 1829) .........................................................................................................................16

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------- x

JOSEPH SROUR,

                                    Plaintiff,

                v.

NEW YORK CITY, New York,
KEECHANT SEWELL, in her Official
Capacity as NYPD Police Commissioner,

                                    Defendants.

-------------------------------------------------------------------------------- x

**DEFENDANTS CITY OF NEW YORK AND COMMISSIONER KEECHANT SEWELL'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

22-CV-0003 (JPC)

## PRELIMINARY STATEMENT

Plaintiff brought this action challenging, under the Second Amendment, the provisions directing that the NYPD consider an applicant's arrest history (Title 38 of the Rules of the City of New York ("RCNY") §§ 3-03(a) & 5-10(a)), lack of candor (38 RCNY §§ 3-03(e) & (n) and 5-10(e) & (n)), and driving history (38 RCNY §§ 3-03(h) & 5-10(h)) when making a determination regarding an application for a handgun license and a rifle/shotgun license. Plaintiff also challenges New York City Administrative Code ("Ad. Code") § 10-303(a)(2) & (9) which provides that an applicant for a rifle/shotgun license is not entitled to a license if such person, inter alia, "is not of good moral character" or "good cause exists for the denial" of the application, and Ad. Code § 10-310 which makes it a misdemeanor to, inter alia, possess or purchase a firearm without a license.  This challenge follows the denial of plaintiff's applications for a handgun permit and a rifle/shotgun permit to keep firearms in his home because plaintiff lacked candor on his application by omitting two prior arrests and prosecutions, one for attempted murder, and because of an egregious history of moving violations demonstrating an inability to comply with license requirements.  However, plaintiff does not bring an as-applied challenge to the statutory provisions and therefore the facts of the denial of plaintiff's

applications are of no material relevance.  Rather, he brings only facial challenges and in order to prevail in this matter he must prove that there is <u>no</u> application of each of the challenged regulations that would be constitutional.  Plaintiff cannot meet this standard, and the motion for summary judgment must be denied.

Plaintiffs' motion follows the United States Supreme Court's decision in <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S. Ct. 2111 (2022), which struck down New York State's requirement that an applicant seeking a license to publicly carry a firearm outside of the home or place of business must demonstrate "proper cause" to the applicable licensing official.[1]  While <u>Bruen</u> also established a modified test to evaluate Second Amendment claims, it should be noted that the Court's decision did not instantaneously lay waste to every municipal firearm regulation.  Indeed, the majority and concurring opinions took great pains to confirm that municipalities are not powerless to address the epidemic of gun violence that afflicts our country.  Specifically, the opinions confirm that local governments may have firearm licensing schemes.  Here, the challenged regulations, which require that an individual have a license to possess a firearm in the City and direct the licensing authority to consider the individual's "good moral character" and whether that individual is "responsible" and "law-abiding" do not implicate the narrow holding of <u>Bruen</u> because they do not restrict licenses to those who have demonstrated a special need.  Accordingly, plaintiff is not entitled to summary judgment and his motion should be denied.

---

[1] The "proper cause" requirement was used only when applicants were seeking a license to carry a firearm outside of the home or place of business, and was not used to evaluate plaintiff's applications, which sought licenses to keep handguns and rifles and shotguns in his home. However, <u>Bruen</u> is relevant here to the extent it modified the test to evaluate Second Amendment claims.

## STATEMENT OF FACTS

Plaintiff specifically withdrew his claim of an as-applied challenge under the Second Amendment of the Constitution and his claim of preemption.  See Minute Entry dated November 3, 2022, Lulich Decl., Exhibit C ("Plaintiff withdrew his as-applied challenge and state preemption claim. Plaintiff shall move for summary judgment as to liability with respect to his facial challenge…").  He did so to avoid the discovery sought by defendants regarding the facts and circumstances of the denial of his applications and to be rid of the disputed issues of material fact preventing him from proceeding straight to summary judgment. Id.  In particular, plaintiff disputes the License Division's finding that he knowingly failed to disclose material information on his applications, and the extent and type of moving violations on his record.  See Complaint, Lulich Decl., Exhibit A at ¶¶ 97-98; Answer, Lulich Decl. Exhibit B at ¶¶ 91, 93, and 97-98.  However, because plaintiff chose to proceed only upon a claim that the regulatory provisions at issue are facially unconstitutional (Minute Entry, Lulich Decl., Exhibit C), the facts of plaintiff's applications and the reason for denial of his applications are of no moment.

Plaintiff challenges certain portions of the Ad. Code and RCNY governing the issuance of firearm licenses in the City of New York ("City").  Specifically, plaintiff challenges Ad. Code § 10-303(a)(2) & (9), which directs that "No person shall be denied a permit to purchase and possess a rifle or shotgun unless the applicant… (2) is not of good moral character;… or, (9)   unless good cause exists for the denial of the permit."  Further, plaintiff challenges Ad. Code Title 10, § 3-310 which makes it a misdemeanor punishable by a fine of up to one thousand dollars and/or up to one year imprisonment to possess rifle or shotgun without a license.

In addition, plaintiff challenges 38 RCNY § 3-03(a), (e), (h) & (n) which direct that the defendants consider the following factors in determining whether an applicant for a

rifle/shotgun permit has "the essential character, temperament and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."

> (a)  The applicant has been arrested, indicted or convicted for a crime or violation except minor traffic violations, in any federal, state or local jurisdiction.
> \*\*\*
> (e)  The applicant made a false statement on her/his application, or failed to disclose her/his complete arrest history, including sealed arrests. Sealed arrests are made available to the License Division pursuant to Article 160 of the Criminal Procedure Law when an application has been made for a permit to possess a gun.
> \*\*\*
> (h)  The applicant has a poor driving history, has multiple driver license suspensions or has been declared a scofflaw by the New York State Department of Motor Vehicles.
> \*\*\*
> (n)  Other information that demonstrates a lack of good moral character, including but not limited to an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, or an inability to maintain rifle/shotgun possession in a manner that is safe to oneself or others. In evaluating incidents or circumstances pursuant to this section, the License Division shall consider all relevant factors, including but not limited to the number, recency and severity of incidents and the outcome of any judicial or administrative proceedings.

38 RCNY § 3-03.

Similarly, plaintiff challenges 38 RCNY § 5-10(a), (e), (h), & (n) which direct respondents to consider the same factors in determining applications for a handgun license.

> (a)  The applicant has been arrested, indicted or convicted for a crime or violation except minor traffic violations, in any federal, state or local jurisdiction.
> \*\*\*
> (e)  The applicant made a false statement on their application, or failed to disclose their complete arrest history, including sealed arrests. Sealed arrests are

made available to the License Division pursuant to
Article 160 of the Criminal Procedure Law when an
application has been made for a license to possess a
gun.

*\*\**

(h)  The applicant has a poor driving history, has
multiple driver license suspensions or has been declared
a scofflaw by the New York State Department of Motor
Vehicles.

*\*\**

(n)  Other information that demonstrates the lack of
good moral character, including but not limited to an
unwillingness to abide by the law, a lack of candor
towards lawful authorities, a lack of concern for the
safety of oneself and/or other persons and/or for public
safety, and/or an inability to maintain handgun
possession in a manner that is safe to oneself or others.

38 RCNY § 5-10.

## <u>STANDARD OF REVIEW</u>

Summary judgment should be granted in favor of the moving party "if the
pleadings, the discovery and disclosure material on file, and any affidavits show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law." FED. R. CIV. P 56(c).    A motion for summary judgment, therefore, requires the
party with the burden of proof to "make a showing sufficient to establish the existence of an
element essential to that party's case… since a complete failure of proof concerning an essential
element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex
Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The Court must resolve all ambiguities and draw
all reasonable inferences in the light most favorable to the party opposing the motion.  <u>Quaratino
v. Tiffany & Co.</u>, 71 F.3d 58, 64 (2d Cir. 1995); <u>Twin Laboratories, Inc. v. Weider Health &
Fitness</u>, 900 F.2d 566, 568 (2d Cir. 1990).

## ARGUMENT

### POINT I

### PLAINTIFF'S ATTEMPTS TO RAISE ARGUMENTS OF AS-APPLIED CONSTITUTIONAL VIOLATIONS OR PRE-EMPTION MUST FAIL BECAUSE THESE CLAIMS WERE WITHDRAWN

Plaintiff appears to attempt to raise arguments in his motion for summary judgment that he voluntarily withdrew.  First, to the extent plaintiff's memorandum attempts to argue that respondents' determinations denying plaintiff's applications for firearm licenses were unconstitutional, this argument has no bearing on the facial constitutionality of the challenged provisions, and therefore, no bearing on the motion before this Court, because plaintiff withdrew his as-applied challenges.  See, e.g., Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl's Mem.") at pp. 1-2, 10, 11 at FN 12, 12, and 13.  Even if plaintiff can demonstrate that his Second Amendment rights were violated as a result of any of the challenged regulations, he is not entitled to summary judgment because he cannot demonstrate that there is no constitutional application of the regulations.  Further, the Court cannot credit plaintiff's version of the disputed facts because plaintiff is the movant here, see, e.g., Quaratino, 71 F.3d at 64, and specifically chose to abandon the as-applied claim in order to avoid discovery on the very facts at issue, Minute Entry, Lulich Decl., Exhibit C.

Second, plaintiff argues that "state and federal statutes already identify" the factors to be considered in determining applications for firearms licenses and that therefore no additional factors may be considered. Pl. Mem. at p. 11 Again, plaintiff attempts to make a pre-emption argument notwithstanding that he voluntarily withdrew his pre-emption claim and represented to the court that he wished to proceed only with his facial Second Amendment claim. Accordingly, any attempts to resurrect a pre-emption claim must fail.

- 6 -

## POINT II

### PLAINTIFF CANNOT MEET HIS BURDEN TO DEMONSTRATE THAT THE CHALLENGED PROVISIONS ARE FACIALLY UNCONSTITUTIONAL

**A.**     **Legal Standard for Facial Constitutional Challenges**

To succeed in a facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987); see also N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015). "Because '[t]he fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid,' litigants bringing facial challenges must meet a 'heavy burden.'" United States v. Jimenez, No. 15-CR-0496 (LGS), 2016 U.S. Dist. LEXIS 73169, at *3-4 (S.D.N.Y. June 3, 2016) (quoting Salerno, 481 U.S. at 745).   Consequently, if the Court concludes that a challenged regulation would be constitutional in some applications, but not others, the facial standard challenge should result in that statute being upheld.  See, e.g., Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 451 (2008) (directing that facial challenges run contrary to the "fundamental principle of judicial restraint that courts should not "formulate a rule of constitutional law broader than is required by the precise facts to which is to be applied.") (quoting Ashwander v. TVA, 297 U.S. 288, 346-47 (1936)).  Thus, if the Court finds that the challenged provisions can be applied constitutionally, the motion for summary judgment should be denied and plaintiff's Complaint dismissed.

**B.**     **Second Amendment Standard**

The Supreme Court's decisions in District of Columbia v. Heller, 554 U.S. 570 (2008), McDonald v. Chicago, 561 US. 742 (2010), and Bruen, 142 S. Ct. at 2111, collectively

establish that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home and carry a handgun in public for purposes of self-defense.   While these decisions reshaped the landscape of Second Amendment jurisprudence, their actual holdings were narrow in scope.  Indeed, the Second Amendment, like other constitutional rights, is not unlimited.  See Heller, 554 U.S. at 626.  It is not a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."   Id. The Supreme Court recognized that handgun violence is a serious concern in the United States, and asserted that the Constitution leaves policymakers with a number of tools to address this problem.  See id. at 636; Bruen, 142 S. Ct. at 2133 (stating that the Second Amendment is not a "regulatory straightjacket").

When reviewing a government regulation under the Second Amendment, Bruen set forth the test as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."   Id. at 2129-30 (internal quotation marks and citations omitted).

Despite the guidance offered by the Supreme Court, Bruen leaves a number of questions unanswered for municipalities considering firearm regulations and litigants who seek to defend or challenge such laws, including what period of history is relevant to analyzing the Nation's tradition of firearm regulation.  Plaintiff's assertion that the Founding era is the only relevant period of history (Pl. Mem. at pp. 5-6, 10, 13-14, and 14-15), ignores statements in both Bruen and Heller regarding the ratification of the Fourteenth Amendment.  While leaving the

question for another case, the Court strongly suggested that evidence contemporaneous with the ratification of the Fourteenth Amendment (all well as the Second Amendment) is highly relevant.[2]  First, the Court itself explored evidence from the years preceding and post-dating ratification to evaluate the constitutionality of New York State's "proper cause" requirement.  See Bruen, 142 S. Ct. at 2150-53.  Second, the Court noted a scholarly debate as to whether "courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope."  Id. at 2138 (emphasis added).  This language demonstrates that the debate concerns *how much* importance to attribute to historical evidence from the Fourteenth Amendment's ratification period, and not whether that evidence deserves any weight.  Indeed, some scholars have argued that the Reconstruction era is the most relevant period for determining the validity of state laws.  See Carina Bentata Gryting & Mark Anthony Frassetto, *NYSRPA v. Bruen and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. 60, 64 n.22 (2022); see also Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 123 n. 11 (2015).  Accordingly, this Court is not limited to the Founding era and certainly may consider the accepted licensing requirements circa 1868.

In any event, as described more fully below, it is clear that the Court did not disturb the requirement to obtain a license in order to possess firearms, and endorsed the licensing regimes of 43 states.  See Bruen, 142 S. Ct at 2123 n.1, 2138 n.9. 1.  Nor did these cases decide "who may lawfully possess a firearm…."  Bruen, 142 S. Ct at 2157 (Alito, J.,

---

[2] This was also very clearly stated by the majority opinion in Heller.  The Court in that case stated that post-enactment history that sheds light on "the public understanding of a legal text … is a critical tool of constitutional interpretation."  554 U.S. at 605.

concurring).  The Supreme Court further emphasized that the rights announced in the trilogy of cases belonged only to <u>responsible</u>, <u>law-abiding</u> individuals.  Accordingly, plaintiff's arguments, which rely on the premise that "firearm licensing did not exist in the Founding Era" (Pl. Mem. at p. 14), fail.

      C.       **The Challenged Regulations Are Not Facially Unconstitutional**

      The challenged regulations, which require that an individual have a license to possess a firearm in the City and direct the licensing authority to consider the individual's "good moral character" and whether that individual is "responsible" and "law-abiding" do not implicate the narrow holding of Bruen.  <u>Bruen</u> held that a specific standard for the issuance of a carry license – a requirement of showing a special need distinct from that of the general community – violated the Second Amendment because it prevented law-abiding New Yorkers from carrying a gun for purposes of self-defense.  This limited holding was emphasized in the concurring opinions.  For example, Justice Alito stressed that the holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun…. Nor have we disturbed anything that we said in <u>Heller</u> or <u>McDonald v. Chicago</u>, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns."  <u>Bruen</u>, 142 S. Ct. at 2157 (Alito, *J.*, concurring). [3]

      In fact, <u>Heller</u> and <u>Bruen</u> identified a number of "longstanding," "presumptively lawful regulatory measures."  <u>Heller</u>, 554 U.S. at 626-27, n.26, <u>Bruen</u>, 142 S. Ct. at 2133-34, 2138 n.9, 2150, 2162 (Kavanaugh, *J.*, concurring).  The Court stated that the regulatory measures identified were not meant to be an exhaustive list.  <u>See</u> <u>Bruen</u>, 142 S. Ct. at 2162.  These

---

[3] Justice Kavanaugh also wrote separately to "underscore … the Court's decision does not prohibit … the imposition of licensing requirements for carrying a handgun for self-defense." <u>Id.</u> at 2161 (Kavanaugh, *J.*, concurring).

"presumptively valid" regulations presume a licensing scheme to determine who meets the standards of fitness for a firearm license.  In Heller, the Supreme Court explicitly stated that nothing in its decision "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill…" and noted that the Second Amendment protected the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 626-27 & 635 (emphasis added). In fact, between the majority and concurring opinions in Bruen, the Court repeated the term "law-abiding" eighteen (18) times.   Accordingly, licensing requirements, like those set forth in Ad. Code Chapter 10 and RCNY §§ 3-03 & §§ 5-10 that identify "law-abiding" persons through a "good moral character" standard supported by objective factors are presumptively constitutional.  Heller, 554 U.S. at 635; McDonald, 561 U.S. at 786; Bruen, 142 S. Ct. at 2133-34, 2138 n.9, 2150, 2162 (Kavanaugh, J., concurring).

To the extent plaintiff argues that no licenses were required to keep and carry firearms circa 1791 and therefore localities may not regulate the possession of firearms by individuals who are not "law-abiding" and "responsible" citizens, this argument fails for the reasons described above.  Notably, plaintiff's memorandum is devoid of citations to source material, statutes, historical analysis, or historical legal precedent to support the assertion that governments did not require individuals to seek permission to keep or bear firearms.[4]  Nor does plaintiff provide any historical analysis or contemporary statements regarding the ratification of the Second Amendment to support the conclusory assertion that the challenged regulations are

---

[4] Indeed, localities did regulate firearms before, during, and after the ratification of the Bill of Rights.  One common type of regulation prohibited even the discharge of a firearm within the bounds of towns/cities and/or any public street or highway.  See Robert H. Churchill, *Rethinking the Second Amendment:  Gun Regulation, the Police Power, and the Right to Keep Arms in Early America:  The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162-63 (2007) (discussing laws prohibiting the shooting of guns in the cities of Boston, New York, and Philadelphia, among other places).

"entirely inconsistent with this Nation's traditional history of firearm regulation." Pl. Mem. at p. 12. Rather, plaintiff relies almost entirely on the text of the <u>Bruen</u> decision. This argument fails because, as plaintiff concedes, "<u>Bruen</u> did not strike down licensing." Pet. Mem. at p. 15; <u>see also Bruen</u>, 142 S. Ct at 2123 n.1, 2138 n.9. 1.

Further, plaintiff's argument that the challenged regulatory provisions are unconstitutional because respondents may not limit firearm licenses to individuals who are of "good moral character" fails. The Court in <u>Heller</u> directed that the Constitution leaves a "variety of tools" to address the problem of gun violence. <u>See Heller</u>, 554 U.S. at 636. Similarly, in <u>McDonald</u>, the Supreme Court emphasized that the Second Amendment "limits, but by no means eliminates," governmental discretion to regulate activity falling within the scope of the right and that incorporation "does not imperil every law regulating firearms." 561 U.S. at 904. In <u>Bruen</u>, the Supreme Court left intact these assurances that the government may impose firearm regulations that do not prevent responsible, law-abiding citizens from exercising their Second Amendment rights. 142 S. Ct at 2122.

Plaintiff's argument that Ad. Code § 3-310 violates the Second Amendment because it prohibits possession of a firearm without a license fails for the reasons above. It is axiomatic that if respondents may require a license to possess a firearm, it may impose a penalty for noncompliance with that licensing scheme. In any event, courts have found that there are appropriate historical antecedents for the criminalization of possession of a firearm for individuals that do not meet the "law-abiding, responsible" standard for firearm possession. <u>See United States v. King</u>, No. 21-CR-0255 (NSR), 2022 U.S. Dist. LEXIS 183586, *5 (S.D.N.Y. Oct. 6, 2022) (upholding statute prohibiting possession of firearm by individual convicted of a felony); <u>United States v. Gonzalez</u>, 2022 U.S. App. LEXIS 26532, *2 (7th Cir. Sept. 22, 2022).

- 12 -

Accordingly, the provision in Ad. Code § 3-310 making it a misdemeanor to possess a firearm in the City without a license is not facially unconstitutional.

Finally, the specific factors set forth for consideration in 38 RCNY § 3-03(a), (e), (h) & (n) and 38 RCNY § 5-10(a), (e), (h) & (n), used as means of determining whether an applicant is "responsible" and "law-abiding," are not facially unconstitutional under the <u>Bruen</u> test.   Notably, plaintiff challenges some, but not all, of the factors to be considered in determining "good moral character" when reviewing rifle/shotgun and handgun license applications.   Each challenged subsection passes constitutional muster because they are consistent with historical analogues regulating firearm possession by categories of people perceived by society to be dangerous, or, put another way, not "peaceable" or "law-abiding." <u>See United States v. Rowson</u>, No. 22-CR-0310 (PAE), 2023 U.S. Dist. LEXIS 13832, *55 (S.D.N.Y. Jan. 26, 2023) (dismissing claim challenging, under the Second Amendment standard set forth in <u>Bruen</u>, a federal statute making it a crime to possess a firearm for individuals under federal indictment).

Sources demonstrate that Founding-era regulations restricted firearms sales to people that the Founders deemed dangerous or potentially dangerous. For example, the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, identified in Heller as a "highly influential" "precursor" to the Second Amendment, (<u>Heller</u>, 554 U.S. at 604) recognized that "citizens have a personal right to bear arms unless for crimes committed, or real danger of public injury." <u>United States v. Skoien</u>, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (<u>quoting</u> 2 Bernard Schwarz, The Bill of Rights: A Documentary History 662, 665 (1971)).   Several colonies (or states) also passed statutes disarming classes of people deemed to be threats, including those unwilling to take an oath of allegiance (to the crown

and later the states), slaves, and native Americans. See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200 (5th Cir. 2012); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157-60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004); Joyce Lee Malcolm, *To Keep and Bear Arms* at 140-41 (1994). Although dangerousness was not the only reason for limiting access to firearms "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." Kanter v. Barr, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). Thus, several founding-era sources confirm that the Second Amendment right was historically "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." Saul Cornell, "*Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002).

Perceived dangerousness, using certain categories or classes as proxies, was also a basis to restrict firearm ownership in the Founding era, as described in a recent decision in this District:

> There is also ample evidence of colonial and revolutionary-era laws that disarmed groups of people perceived as per se dangerous, on the basis of their religious, racial, and political identities. See, e.g., Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 115-16 & accompanying notes (2013) (citing laws barring gun sales to Native Americans, due to fears of violence; free and enslaved Black or mixed-race persons, even where completely law-abiding, out of fear of revolution against white masters; and Catholics or Loyalists); Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 L. & CONTEMPORARY PROBS. 55, 72 & nn.103-04 (2017) (citing examples of colonial and revolutionary era laws disarming those who expressed dangerous opinions or refused to swear loyalty to the new American government); see also Samuel Cornell, *A Well*

*Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506-07 (2004) (citing examples of laws disarming those who refused to swear loyalty oaths) ("The security of the community outweighed any right a person might have to possess a firearm."); see also Waters v. State, 1 Gill 302, 309 (MD. 1843) (stating that, because free Black persons were treated as a "dangerous population," "laws have been passed to . . . make it unlawful for them to bear arms")…

It goes without saying that, in our modern era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness-would be anathema, and clearly unconstitutional. See Drummond v. Robinson Twp., 9 F.4th 217, 228 n.8 (3d Cir. 2021) (discussing such laws). But the Second Amendment's inquiry into historical analogues is not a normative one. Viewing these laws in combination, the above historical laws bespeak a "public understanding of the [Second Amendment] right" in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness. Bruen and Heller recognized one such longstanding classification—on gun possession by felons, See Bruen, 142 S. Ct. at 2137; Heller, 554 U.S. at 592; see also Medina [v. Whittaker, 913 F.3d 152, 159 (D.C. Jan. 18, 2019)] (collecting cases evidencing that the scope of the Second Amendment was understood to permit the exclusion of dangerous categories of persons).

Rowson, 2023 U.S. Dist. LEXIS 13832 at *56-58.

Colonial surety laws, which restricted citizens' firearm access based on allegations of wrongdoing, also provide a historical analogue because they acted as a mechanism to regulate firearm possession based upon perceived dangerousness of the individual. By 1791, six colonies had codified the common-law surety system. See Acts and Laws of His Majesty's Province of New-Hampshire: In New England; with Sundry Acts of Parliament 1759 (1701 statute); Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 statute); Statutes at Large of Pennsylvania from 1682 to 1801, pg. 23 (1896) (1700 statute); Laws of the State of Delaware from the Fourteenth Day of October, One Thousand

Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 statute); Statutes at Large; Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619, pg. 41 (1823) (1789 statute); General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index (1840); see also William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) ("[E]ven the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace" and "[i]f he refused he would be liable to imprisonment.")

The challenged regulations are consistent with these historical analogues by providing factors for the licensing official to consider in determining whether an applicant is "law-abiding" and "responsible" and for the purpose of ensuring public safety.  Sections 3-03(a) and 5-10(a) of the RCNY provide for consideration of the applicant's history of arrests, indictments, and convictions of crimes or violations other than minor traffic violations.  The government can, consistent with the Second Amendment, prevent the possession of a firearm by an individual who has been accused or convicted of a crime.  See Rowson, 2023 U.S. Dist. LEXIS 13832 at *52-59 (holding that prohibiting the possession of firearms by individuals under indictment is consistent with the historical tradition of firearm regulation).  Indeed, it is clearly constitutionally appropriate to apply 38 RCNY § 3-03(a) and 38 RCNY § 5-10(a) under numerous scenarios.   For example, where an individual has been convicted of, or is under indictment for, a violent crime.  Nor is it per se unconstitutional to consider criminal charges that

did not result in a convictions.  For example, an individual may be charged with serious, violent crimes and then plead to lesser violations in exchange for testimony that implicates the individual in violence.  Or, criminal charges may be dismissed on speedy trial grounds or due to procedural defects in an investigation or prosecution, despite ample evidence that the individual did in fact commit the charged crimes.  It does not run afoul of the Second Amendment to consider past arrests, charges, and convictions to determine whether an applicant for a firearm is "responsible" and "law-abiding."  Accordingly, 38 RCNY § 3-03(a) and § 5-10(a) are not facially unconstitutional, because they can be constitutionally applied.

Second, Sections 3-03(e) and 5-10(e) of the RCNY provide for consideration of false statements made by the applicant on the application for a firearm.  Given that the Second Amendment permits the government to implement a licensing scheme and regulate firearm possession and use, that government must be able to require compliance with that licensing scheme, including the provision of necessary information.  It would defeat the purpose of an application process if the licensing authority could not deny an application based on the provision of false information, including, e.g., false criminal history, a false name, or false identifying information.  Further, because the City's application includes a signed affirmation of the truth of the contents of the application pursuant to New York Penal Law Section 210.45, an applicant's affirmed false statement could in itself demonstrate that the applicant is not "responsible" or "law-abiding."  Because 38 RCNY § 3-03(e) and § 5-10(e) can be constitutionally applied, they are not facially unconstitutional.

Sections 3-03(e) and 5-10(e) of the RCNY provide for consideration of an applicant's poor driving history, license suspensions, or declarations as a scofflaw by the State

Department of Motor Vehicles.[5]   For example, a pattern of violations demonstrating that an individual has repeatedly operated a vehicle in a manner that put people and property at risk evidences an individual who is not "responsible" and "law-abiding" and who will put the public safety at risk with a firearm.   Again, in line with historical analogues permitting consideration of an individual's ability to follow laws, and in particular to act in a manner consistent with public safety, the consideration of an egregious history of traffic violations and drivers' license suspensions is not unconstitutional in every application.

Finally, Sections 3-03(e) and 5-10(e) of the RCNY provide for consideration of information demonstrating "lack of good moral character, including but not limited to an unwillingness to abide by the law, a lack of concern for the safety of oneself and/or other persons and/or for public safety, or an inability to maintain [firearm] possession in a manner that is safe to oneself or others."   For the same reasons described above, this subsection is entirely analogous to historical regulations restricting firearm use and ownership "unless for crimes committed, or real danger of public injury." Skoien, 614 F.3d at 640.

---

[5] Title 38, § 3-03 and § 5-10 direct that all of factors (a) through (n) be considered for each application.   This is demonstrated in the Final Determinations issued to plaintiff, who was not denied a license based upon any one of the factors, but, rather the combination of four factors. See Srour Decl., Exhibits 2, 3, and 4.

## <u>CONCLUSION</u>

For all the reasons set forth herein, the court should deny plaintiff's motion for summary judgment in its entirety and dismiss the Complaint with such other and further relief as this court deems proper.

Dated:      New York, New York
           February 21, 2023

                                  HON. SYLVIA O. HINDS-RADIX
                                  Corporation Counsel of the City of New York
                                  Attorney for Defendants
                                  100 Church Street
                                  New York, New York  10007
                                  (212) 356-2369

                                  By: _____/S_____
                                        Aimee K. Lulich

cc:      Amy Bellantoni, Esq. (By ECF and Email)
          Attorney for Plaintiff

22-CV-0003 (JPC)

UNITED STATE DISTRICT COURT
southern DISTRICT OF NEW YORK

JOSEPH SROUR,

                                          Plaintiff,

v.

NEW YORK CITY, New York,
KEECHANT SEWELL, in her Official
Capacity as NYPD Police Commissioner,

                                          Defendants.

**DEFENDANTS CITY OF NEW YORK AND COMMISSIONER KEECHANT SEWELL'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**HON. SYLVIA O. HINDS-RADIX**

Corporation Counsel of the City of New York
*Attorney for Defendants City of New York & Keechant Sewell*
100 Church Street Rm 5-143
New York, N.Y.  10007
Of Counsel: Aimee K. Lulich
Tel:  (212) 356-2369
*NYCLIS No.*

*Due and timely service is hereby admitted.*
*New York, N.Y.          , 2023 . . .*
*        Esq.*
*Attorney for*