UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
JOSEPH SROUR,

                         Plaintiff,                    Case No.: 22 Civ. 3 (JPC)

        -against-


NEW YORK CITY, New York,
KEECHANT SEWELL, in her Official
Capacity as NYPD Police Commissioner,

                        Defendants.
------------------------------------------------------x


# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S

# MOTION FOR SUMMARY JUDGMENT


**THE BELLANTONI LAW FIRM, PLLC**
***Attorneys for Plaintiff***
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**info@bellantoni-law.com**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................... i

I. CONDUCT PROTECTED BY THE SECOND AMENDMENT IS ABSOLUTE ................... 1

II. THE CITY FAILED TO MEET ITS BURDEN UNDER THE *BRUEN* TEST ....................... 4

    A. The Burden of Historical Proof Belongs to the City ................................................... 4

    B. *Bruen* Rejected Subjective, Discretionary Licensing Schemes as Unconstitutional . 6

        i. "Moral Character" and "Good Cause" Requirements Under 38 RCNY 3-03,
            38 RCNY 5-10, and NYC Admin. Code 10-303(2) and (9) ........................... 6

        ii. 38 RCNY 3-03(n) and 38 RCNY 5-10(n) ...................................................... 8

    C. The City Failed to Identify an Historical Analogue for its Regulations ................. 8

        i. Subsection (a) – denial based on an arrest ....................................................... 9

        ii. Subsection (e) – denial based on failure to disclose complete arrest history,
            including sealed arrests and/or providing false information ........................ 11

        iii. Subsection (h) – denial based on driving history .......................................... 11

        iv. NYC Admin. Code 3-310 ............................................................................. 13

III. THE CITY GROSSLY MISUNDERSTANDS THE *BRUEN* DECISION ......................... 14

CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tradition P'ship, Inc. v. Bullock*,
   565 U.S. 1187 (2012) .......................................................................................... 12

*Barker v. Wingo*,
   407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)......................................... 12

*D.C. v. Heller*,
   554 U.S. 570 (2008) ..................................................................................... 1, 2, 5

*Hudson v. Michigan*,
   547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)....................................... 12

*McDonald v. City of Chicago, Ill.*,
   561 U.S. 742 (2010) ............................................................................................. 3

*Miranda v. Arizona*,
   384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)......................................... 12

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
   700 F.3d 185 (5th Cir. 2012) .............................................................................. 10

*Shuttlesworth v. City of Birmingham, Ala.*,
   394 U.S. 147 (1969) ........................................................................................... 13

*United States v. Cruikshank*,
   92 U.S. 542, 23 L.Ed. 588 (1876)......................................................................... 5

*United States v. Leon*,
   468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)....................................... 12

*United States v. Rowson*,
   2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) ......................................................... 9

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ......................................................................... 9, 10

**Statutes**

18 USC 922(n) ........................................................................................................... 9

i

**Regulations**

38 RCNY 3-03 ................................................................................................ 6, 7, 8, 9
38 RCNY 5-10 ................................................................................................ 6, 7, 8, 9
NYC Admin. Code 3-310 ............................................................................................ 13
NYC Admin. Code 10-303 ........................................................................................ 6, 7

**Other Authorities**

"Necessary to the Security of A Free State",
   83 Notre Dame L. Rev. 1 (2007) ............................................................................. 5

"Not all History is Created Equal: In the Post-*Bruen* World, the Critical Period for Historical Analogues
   is when the Second Amendment was Ratified in 1791, and not 1868", Mark W. Smith (2022) .... 3, 4, 8

## I.  CONDUCT PROTECTED BY THE SECOND AMENDMENT IS ABSOLUTE

The oft-quoted phrase from *Heller* that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" is routinely tendered by the government as some sort of validation of its patently unconstitutional laws.[1] The collective thought being that *whatever* restriction the government places on Second Amendment rights passes constitutional muster because the right is not "absolute"– indoctrinated groupthink that is repugnant to the command that the Right "shall not be infringed."

But the *Heller* Court clarified, "we do not read the Second Amendment to protect the right of citizens to carry arms for *any* sort of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." *D.C. v. Heller*, 554 U.S. 570, 595 (2008) (emphasis supplied).[2]

Plaintiff is not seeking to "keep and carry *any* weapon whatsoever in *any* manner whatsoever and for *whatever* purpose." He is seeking to possess weapons in common use, in his home, for self-defense – conduct that *Heller* laid to rest as falling within the scope of the Second Amendment's protection.

Plaintiff's right to possess weapons in common use for lawful purposes, like self-defense, **is absolute** because the Second Amendment *presumptively protects* conduct covered by the plain text of the Amendment.

> "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively protects** that conduct."

*Bruen*, at 2126 (emphasis added).

---

[1] *D.C. v. Heller*, 554 U.S. 570, 626 (2008).
[2] What is **not** absolute are activities that fall outside of the Second Amendment's protections. For instance, using a weapon in the commission of a crime is not conduct protected by the Second Amendment, just as defamation is not conduct protected by the First Amendment.

The right to possess and carry firearms for self-defense is a *guaranteed* individual right.

> "Putting all of these textual elements together, we find that they **guarantee the individual right** to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment."

*Heller*, at 592 (emphasis added).

> "Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves. And today, no less than in 1791, the Second Amendment **guarantees their right to do so**."

*Bruen*, at 2161.

Because "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*"[3] (emphasis supplied), the City was required to identify a historical analogue from the Founding Era to demonstrate that the challenged regulations are consistent with this Nation's history and tradition of firearm regulation.

And while *Bruen* recognized that *Heller* "reiterated that evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation"[4], the *Bruen* majority made clear that "to the extent later history contradicts what the text says, the text controls." *Bruen*, at 2137.

> "Liquidating indeterminacies in written laws is far removed from expanding or altering them.
>
> Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."

*Bruen*, at 2137 (cleaned up).

---

[3] *Bruen*, at 2136 quoting, *Heller* at 634-35.
[4] *Bruen*, at 2136.

The City urges the Court to deviate from Supreme Court jurisprudence interpreting the Bill of Rights, going so far as to advise that "this Court is not limited to the Founding Era and certainly may consider the accepted licensing requirements circa 1868."[5]

Putting aside for the moment the fact that all Supreme Court cases interpreting the Bill of Rights have looked to the Founding Period for determining meaning, not to the late 19th century[6], the Supreme Court was unequivocal in *Heller, McDonald,* and *Bruen*: the Second Amendment does not have one meaning in 1791 against the federal government and another meaning post-1868 against state action.

> "In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing, and this Court decades ago abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights."

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 785–86 (2010) (plurality opinion) (cleaned up).[7]

"The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, at 780.

> "We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense."

*Bruen*, at 2156.

---

[5] City MOL at p. 9.

[6] See, "Not all History is Created Equal: In the Post-*Bruen* World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868", Mark W. Smith (2022) annexed hereto., at p. 80.

[7] The prohibition of judicial interest balancing in Second Amendment challenges, accomplished by the *Bruen* test, also forecloses the City's suggestion that it may impose firearm regulations to "address the problems of gun violence."

3

No other constitutional right is conditioned on governmental discretion, subjective morality tests, unproven accusations, or one's driving history. And "if there is no analogue in the Founding period, one cannot jump … to the late 19th century to look for analogues in the first place." Smith, at p. 30.

## II.    THE CITY FAILED TO MEET ITS BURDEN UNDER THE *BRUEN* TEST[8]

The City failed to identify any historical tradition to justify its regulations, which forecloses the conclusion that Plaintiff's conduct "falls outside the Second Amendment's 'unqualified command.'" *Bruen*, at 2129-30.

### A.  The Burden of Historical Proof Belongs to the City

The City improperly attempts to shift the burden to Plaintiff to identify "source material, statutes, historical analysis, or historical legal precedent to support the assertion that governments did not require individuals to seek permission to keep or bear firearms."[9]

Under the *Bruen* test, the plain text of the Second Amendment presumptively protects possessing (keeping) and carrying (bearing) weapons (Arms)[10] – the conduct being regulated by the City.

Once it is established that the plaintiff's conduct is presumptively protected, the burden shifts to, and remains with, the government. *Bruen*, at 2126. The City – not Plaintiff - has the burden of identifying "source material, statutes, historical analysis, or historical legal precedent" to support its regulations.

---

[8] The City improperly attempts to shift the burden to Plaintiff to identify "source material, statutes, historical analysis, or historical legal precedent to support the governments did not require individuals to seek permission to keep or bear firearms."

[9] City MOL at pp. 11-12.

[10] *Bruen*, at 2126.

The City's proposition that individuals in the Founding Era were required to "seek permission to keep or bear firearms" is repugnant to the Second Amendment. An armed citizenry is "necessary for the security of a free state"[11] – a tenet prompting the codification of the pre-existing right of the people to keep and bear Arms and the declaration that the right "shall not be infringed."[12]

"The threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right - unlike some other English rights - was codified in a written Constitution." *Heller*, at 599.

> "There are many reasons why the militia was thought to be 'necessary to the security of a free State.' First, of course, it is useful in repelling invasions and suppressing insurrections. Second, it renders large standing armies unnecessary - an argument that Alexander Hamilton made in favor of federal control over the militia. Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny."

*Heller*, at 554 597–98 (internal citations omitted).

Notwithstanding *Bruen*'s comments on licensing schemes, discussed immediately below, the Court warned that even shall-issue regimes are subject to constitutional challenges "because any permitting scheme can be put toward abusive ends." *Bruen*, at n. 9. In any case, nothing in the *Bruen* decision relieves the City of its burden to identify a historical analogue, which it has failed to do.

---

[11] "In eighteenth-century political discourse, 'free state' was a commonly used political term of art, meaning 'free country, which is to say the opposite of a despotism." Eugene Volokh, "Necessary to the Security of A Free State", 83 Notre Dame L. Rev. 1, 5 (2007).

[12] "The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.' As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), '[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence.'" *Heller*, at 592.

**B.** ***Bruen*** **Rejected Subjective, Discretionary Licensing Schemes as Unconstitutional**

    i.  *"Moral Character" and "Good Cause" Requirements Under*
        *38 RCNY 3-03, 38 RCNY 5-10, and NYC Admin. Code 10-303(2) and (9)*

The City improperly conflates objective, bright-line disqualifiers to firearm possession, like felony convictions[13] and being under federal indictment[14] with the subjective and discretionary "good cause" and "moral character" criteria set forth in 38 RCNY 3-03, 38 RCNY 5-10 and NYC Admin. Code 10-303(2), (9).

The *Bruen* Court only sanctioned the 43 shall-issue regimes[15] because, "unlike New York's they do not grant open-ended discretion to licensing officials" and contain only "narrow, objective, and definite standards guiding licensing officials", rather than the "appraisal of facts, the exercise of judgment, and the formation of an opinion - features that typify proper-cause standards like New York's." See, *Bruen*, at 2138, n. 9[16], 2162 (cleaned up).[17]

It is through the implementation of objective factors - fingerprint-based background check, mental health records check, and training in firearms handling and in laws regarding the use of force - that the 43 shall-issue jurisdictions ensure that only "law-abiding, responsible citizens" are "bearing arms." *Bruen*, at 2162.

---

[13] City MOL at p. 12.

[14] City MOL at p. 13.

[15] *Bruen* was a public carry case. To the extent that the *Bruen* Court sanctioned licensing schemes at all, it was within the context of individuals seeking a public carry handgun license. Even New York State did not require a rifle license until 2022, and its regulation is limited to semi-automatic rifles. That said, Plaintiff is not challenging the licensing requirement generally.

[16] Justice Kavanaugh, joined by the Chief Justice, reiterated that the "Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense." *Bruen*, at 2161. Notably, neither Justice Kavanaugh nor the majority sanction (or mention) schemes requiring a license to merely possess a firearm in one's home for self-defense.

[17] Even so, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, at 2138.

To the contrary, subjective criteria like "good cause to deny an application" and assessments of an applicant's "moral character" are as unconstitutional as the "proper cause" requirement abolished in *Bruen*.

Justice Kavanaugh shared the majority's view that "New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense." Justice Kavanaugh went on to state that a licensing officer's "unchanneled discretion" violates the Second Amendment right of "ordinary, law-abiding citizens" to self-defense – "the central component" of the Second Amendment right." *Bruen*, at 2161 (quoting, *McDonald*, at 767; *Heller*, at 599.

The City mentions that *Bruen* "did not disturb" and "endorsed" the licensing regimes of 43 states[18], but fails to inform the Court that New York was not one of them. The City continues to implement a may-issue licensing scheme like the outlier jurisdictions rebuked by *Bruen*.

Justice Kavanaugh warned that may-issue licensing schemes may only continue "so long as they employ objective licensing requirements like those used by the 43 shall-issue States." *Bruen*, at 2162.

But the City continues to employ subjective criteria and imbue unfettered discretion in its licensing officials, applying its may-issue scheme not only to public carry licenses but also licenses to simply possess handguns and/or long guns at home for self-defense.

Because 38 RCNY 5-10, 38 RCNY 3-03, and NYC Admin. Code 10-303(2) and (9) empower licensing officials with open-ended discretion to deny individuals the right to possess firearms for self-defense based on subjective assessments of what constitutes "moral character"

---

[18] City MOL at p. 9.

and/or "good cause", rather than "narrow, objective, and definite standards", the regulations violate the Second Amendment and should be permanently enjoined.

ii. *38 RCNY 3-03(n) and 38 RCNY 5-10(n)*

Subsection (n) of 38 RCNY 3-03 and 38 RCNY 5-10 are also subjective factors that imbue broad discretion in the City's licensing officials to decide that "other information demonstrates an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or other good cause for the denial of the permit." For the same reasons discussed above, 38 RCNY 3-03(n) and 38 RCNY 5-10(n) violate the Second Amendment and should be permanently enjoined.

**C.  The City Failed to Identify an Historical Analogue for its Regulations**

Opponents of the Second Amendment routinely shun the 'text, history, and tradition' analysis that has been relied on, and applied by, the Supreme Court in every case interpreting the provisions of the Bill of Rights, including *Heller* and *McDonald*.[19] Rather, they cling to subjective factors and discretionary decision making – like the "proper cause" requirement rejected by *Bruen* - to strip ordinary people of the right to self-defense.

The reason - firearm regulations did not exist until after the ratification of the Second Amendment in 1791.[20] And such regulations involved public carry handguns - not the mere possession of handguns in the home; and there was no regulation of rifles and shotguns.[21]

---

[19] See, Smith.
[20] *Bruen*, at 2145.
[21] *Bruen,* at 2145-2150.

i. *Subsection (a) – denial based on an arrest*

38 RCNY 3-03(a) and 38 RCNY 5-10(a) deny a license for handguns, rifles, and shotguns if the applicant "has been arrested, indicted or convicted for a crime or violation except minor traffic violations, in any federal, state or local jurisdiction."

Plaintiff challenges the language "has been arrested." This regulation is inconsistent with the text, history, and tradition of the Second Amendment, and the City has failed to identify an historical analogue.

The City's reliance on *United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023), is inapposite. *Rowson* upheld the constitutionality of 18 USC 922(n), which prohibits firearm possession by individuals under federal indictment for a crime punishable by imprisonment for a term exceeding one year, a conviction of which would be a felony, which would also be a disqualifier to firearm possession under federal and state law.

Without going into an analysis of *Rowson* and the cases relied on, the "arrest" language of subsection (a) is far broader than the narrow language of 922(n). Subsection (a) encompasses anyone who has ever been arrested, even if the charges were dismissed (like Plaintiff), allows the City to consider the underlying allegations (even if the charges were dismissed or the District Attorney declined to prosecute). Subsection (a) also encompasses individuals who were arrested and still have charges pending, even if the arrest was for a non-criminal violation or a petty offense that, even if convicted, would not disqualify them from firearm possession under federal or state law.

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) also fails the City. Decided 12 years before *Bruen* and employing the intermediate scrutiny test rejected by *Bruen*, *Skoien* affirmed the constitutionality of 922(g)(9), which prohibits firearm possession by domestic violence

9

misdemeanants, while acknowledging that the first federal statute disqualifying felons and misdemeanants who had been convicted of violent offenses from possessing firearms was not enacted until 1938. *Skoien*, at 640. The above notwithstanding, 922(g)(9)'s bar to firearm possession is based on a *conviction*, not merely being under arrest and/or having charges pending. And, 922(g)(9) pertains not only to a conviction, but a conviction of a violent offense. Certainly, 922(g)(9) does not apply to a past arrest in which the charges were dismissed or the conviction was for a non-criminal violation or a non-violent petty misdemeanor.[22]

The City goes on to reference regulations disarming individuals "perceived as per se dangerous on the basis of their religious, racial, and political identities"[23] which the *Rowan* court acknowledged, "It goes without saying that, in our modern era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness—would be anathema, and clearly unconstitutional." [City MOL at p. 15]; *Rowson*, at *22.

The surety laws also provide no justification for the City's regulations. [City MOL at pp. 15-16]. First, they did not appear until the Antebellum Period and, therefore fall outside of the relevant historical time frame. *Bruen*, at 2148. Even so, surety statutes only required certain individuals to post a bond before carrying weapons in public – they were not a bar to possession of firearms and they did not prohibit firearm possession altogether. *Bruen*, at 2148. The *Bruen* Court considered the "barren record of enforcement [of surety laws] to be simply one additional reason to discount their relevance." *Bruen*, at 2149, n. 25.

---

[22] *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) upholding the prohibition on handgun sales to individuals under the age of 21, was abrogated by *Bruen*. [City MOL at p. 14].
[23] City MOL at pp. 14-15.

ii. *Subsection (e) – denial based on failure to disclose complete arrest history, including sealed arrests and/or providing false information*

Under subsection (e), a license is denied for failure to disclose his complete arrest history, including sealed arrests and/or for providing false information on the application. This regulation is inconsistent with the text, history, and tradition of the Second Amendment, and the City has failed to identify an historical analogue.

Every applicant is subject to fingerprinting and a criminal history and mental health check through the federal and state databases. Like subsection (a) above, denial of a license based on a sealed (dismissed) arrest has no historical analogue, nor has the City identified one.

Under an objective licensing process, incorrect information regarding one's arrest history or other information required by the City's may-issue licensing process is of no consequence. Either the background investigation will reveal objective information that disqualifies the applicant from firearm possession - requiring denial of the license. Otherwise, incorrect information will be immaterial to whether or not the applicant is prohibited from firearm possession under federal or state law.

The City raises concerns for false names, identities, addresses, and the like, which are objectively resolved through applicant fingerprinting and a background investigation. For instance, if a false name were used on the application, no license could be issued to the name provided on the application if it did not coincide with the information contained on the criminal history report from the FBI and DCJS.

iii. *Subsection (h) – denial based on driving history*

Under subsection (h), a license is denied based on a poor driving history. This regulation is inconsistent with the text, history, and tradition of the Second Amendment, and the City has failed to identify an historical analogue.

11

The City relies on the same "public safety" interest balancing rejected by the Supreme Court in *Heller*[24], *McDonald*[25], and *Bruen*[26]. [City MOL at pp. 17-18]. Interest balancing is not part of the *Bruen* test, and the lower courts are without any authority to alter it. See, *Am. Tradition P'ship, Inc. v. Bullock*, 565 U.S. 1187 (2012) (lower courts are bound to follow the decisions of the Supreme Court until they are withdrawn or modified).

In a plurality opinion, the *McDonald* Court acknowledged that "the right to keep and bear arms is not the only constitutional right that has controversial public safety implications.

> "All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category. See, e.g., *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) ("The exclusionary rule generates 'substantial social costs,' *United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which sometimes include setting the guilty free and the dangerous at large"); *Barker v. Wingo*, 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda v. Arizona*, 384 U.S. 436, 517, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Harlan, J., dissenting); *id.*, at 542, 86 S.Ct. 1602 (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases ... will return a killer, a rapist or other criminal to the streets ... to repeat his crime"); *Mapp*, 367 U.S., at 659, 81 S.Ct. 1684." (noting that no case was cited in which the Supreme Court refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications.).

*McDonald*, at 783.

*McDonald* also rejected the government's insistence that, because conditions and problems differ from locality to locality and different jurisdictions have divergent views on the issue of gun control, state and local governments should be allowed to enact any gun control law that they deem to be reasonable because under Supreme Court precedent, if a Bill of Rights

---

[24] *Heller*, at 634–35.
[25] *McDonald,* at 785-86 (In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing).
[26] *Bruen*, at 2131.

guarantee is fundamental from an American perspective, then that guarantee is fully binding on the States, which are limited in their ability to devise solutions to social problems that suit local needs and values. *McDonald*, at 783–85.

    iv. *NYC Admin. Code 3-310*

   NYC Admin. Code 3-310, which makes it a misdemeanor punishable by a fine of not more than one thousand dollars or imprisonment of not more than one year or both to possess a firearm without a license, violates the Second Amendment.

   The City has produced no evidence of a historical tradition of criminalizing the mere exercise of conduct protected by the plain text of the Second Amendment.

> "It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms…
>
> And our decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license. The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands."

*Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969) (internal citations omitted) (reversing conviction for violating discretionary licensing scheme by simply exercising in constitutionally protected activity).

   The only justification offered by the City is that, because *Bruen* allowed licensing schemes to continue, imposing penalties for "noncompliance" are "axiomatic" – an opinion lacking any support in the Founding Era.

   There is no support for a regulation that enforces criminal sanctions for the peaceable possession and/or carriage of firearms for self-defense – a regulation inconsistent with the plain

text of the Second Amendment.  And, where modern regulations contradict the plain text, the text controls. *Bruen*, at 2137.

## III.  THE CITY GROSSLY MISUNDERSTANDS THE *BRUEN* DECISION

The City's belief that the *Bruen* test is only 'implicated' where a firearm license is denied for failure to "demonstrate[] a special need." [City MOL at p. 2] is inane. The *Bruen* test, which displaced this Circuit's two-step intermediate scrutiny test, must be applied to ***all*** Second Amendment challenges.

The only inquiry for this Court is whether the City has proven that the challenged regulations are "consistent with this Nation's historical tradition of firearm regulation" [27]because *only* then "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, at 2126, 2130.

Plaintiff is entitled to summary judgment because the City has failed to meet its burden under the *Bruen* test.

### CONCLUSION

Plaintiff's motion for summary judgment should be granted in its entirety.

Dated:  March 28, 2023
        Scarsdale, New York

                                      THE BELLANTONI LAW FIRM, PLLC
                                      *Attorneys for Plaintiff, Joseph Srour*

                                      _____/s/_____
                                        Amy L. Bellantoni (AB3061)
                                        2 Overhill Road, Suite 400
                                        Scarsdale, New York 10583
                                        abell@bellantoni-law.com

---

[27] *Bruen*, at 2126, 2130.