UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                    :

JOSEPH SROUR,                                      :

                      Plaintiff,                  :

              -v-                            :           22 Civ. 3 (JPC)

                                         :

NEW YORK CITY, New York, and JESSICA TISCH, in :       FINDINGS OF FACT AND
her Official Capacity as NYPD Police Commissioner,   :      CONCLUSIONS OF LAW

                                       :

                      Defendants.               :

                                         :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

In 2019, Defendants New York City and the Commissioner of the New York City Police Department ("NYPD") (collectively, the "City") relied on laws that were not "consistent with the Nation's historical tradition of firearm regulation" to deprive Plaintiff Joseph Srour of his right to possess firearms for lawful purposes in violation of the Second and Fourteenth Amendments to the U.S. Constitution. *Srour v. New York City*, 699 F. Supp. 3d 258, 261 (S.D.N.Y. 2023) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)). Srour sued for damages and other relief under 42 U.S.C. § 1983. On October 24, 2023, the Court held that the City's laws and regulations that granted its officials broad discretion to deny handgun-license and rifle/shotgun-permit applications based on an applicant's lack of "good moral character" or for other "good cause" violated the Second Amendment in all their applications, and granted summary judgment in Srour's favor. *Id.* at 261-62.

The Court conducted a bench trial on damages on May 29, 2025.[1]  Having considered the evidence admitted at trial, assessed the credibility of the witnesses, and applied the relevant law, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  In doing so, the Court addresses, as apparently a matter of first impression, whether Section 1983 allows for recovery of compensatory damages for a plaintiff's actual injuries caused by the deprivation of his Second Amendment right.  This Court concludes the answer is yes.  Accordingly, the Court awards Srour compensatory damages in the amount of $76,626.25 for the financial harms and emotional distress caused by the City's unconstitutional denial of his firearms applications.  The Court declines to award Srour nominal damages or additional compensatory damages for the deprivation itself.

## I.  Procedural History

On January 2, 2022, Srour sued the City of New York and its police commissioner, challenging the constitutionality of various firearm-licensing provisions of the Rules of the City of New York ("RCNY") and the New York City Administrative Code (the "Administrative Code"), both facially and as applied to him, and seeking monetary, declaratory, and injunctive relief.  Dkt. 1 ("Compl.") at 32-33.  Srour later withdrew his as-applied challenges, as well as his preemption claims, and the Court bifurcated the questions of liability and damages.  *See Srour*, 699 F. Supp. 3d at 265, 289.  On October 24, 2023, the Court granted Srour's motion for summary judgment on three causes of action that challenged the constitutionality of provisions that had been in effect when the City denied his applications.  *Id.* at 289.  The Court held that the then-operative versions of Section 10-303(a)(2) and (a)(9) of the Administrative Code (First Cause of Action); Section 5-10(a), (e), (h), and (n) of Title 38 of the RCNY (Second Cause of Action); and Section

---

[1] The transcript of the bench trial is at Docket Number 71, and is cited herein as "Tr."

3-03(a), (e), (h), and (n) of Title 38 of the RCNY (Third Cause of Action)[2] violated the Second

Amendment in all their applications because the broad discretion they granted City officials was

not "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 261-62 (quoting

*Bruen*, 597 U.S. at 24); *see id.* at 285 (holding that the "magnitude of discretion afforded to [the

City's] licensing officials . . . to evaluate an applicant's 'good moral character' and 'good cause'

in deciding whether to permit that applicant to exercise his or her Second Amendment rights"

violated the Second and Fourteenth Amendments).  As partial relief, the Court declared that

subsections (a)(2) and (a)(9) of Section 10-303 of the Administrative Code were facially

unconstitutional and permanently enjoined the City from enforcing those provisions. *Id.* at 288.

The City filed a notice of interlocutory appeal challenging the Court's injunction as it

pertained to Section 10-303(a)(2) of the Administrative Code, which was the "good moral

character" requirement for the issuance of a rifle and shotgun permit, and moved to stay the

injunction of Section 10-303(a)(2) and Section 10-303(a)(9) pending appeal. *See Srour v. New

York City*, 117 F.4th 72, 76, 80 (2d Cir. 2024).  After this Court granted a temporary stay, the

Second Circuit granted a full stay. *See id.* at 80.

While his appeal was pending, Srour applied again for a rifle and shotgun permit, and this

time the City granted his application. *See id.* at 76-77.  Consequently, on September 9, 2024, the

---

[2] Section 10-303 of the Administrative Code made it unlawful to possess a rifle or shotgun without a permit and identified the absence of "good moral character" and a general notion of "good cause" as legitimate grounds for denying someone such a permit.  N.Y.C. Admin. Code § 10-303.  Section 5-10 of Title 38 of the RCNY, titled "Grounds for Denial of Handgun License," identified grounds for denying a handgun license, including upon a determination of a lack of "good moral character" or the existence of "other good cause," and enumerated factors to be considered in arriving at that determination.  RCNY Tit. 38, § 5-10 (2019) (last amended Dec. 6, 2024).  And Section 3-03 of Title 38 of the RCNY, titled "Grounds for Denial of Permit," similarly provided that an official may deny a rifle or shotgun permit upon a finding of a lack of "good moral character" or the existence of "other good cause," and identified the factors to be considered in making that assessment.  RCNY Tit. 38, § 3-03 (2019) (last amended Dec. 6, 2024).

Second Circuit dismissed the City's appeal as moot, vacated this Court's injunction enjoining the enforcement of Section 10-303(a)(2) of the Administrative Code and its declaration that this subsection was facially unconstitutional, and remanded with instructions to dismiss Srour's claims for injunctive and declaratory relief from Section 10-303(a)(2). *Id.* at 77; *see also id.* at 77 n.2 ("While the district court did enjoin the enforcement of [Section 10-303(a)(9) of the Administrative Code], the City does not challenge that ruling on appeal, and the issue is thus not properly before this Court.").

This Court then lifted the stay, Dkt. 55, permitted the parties to conduct discovery on damages, *see* Minute Entry, Nov. 26, 2024, and scheduled a bench trial, *see* Minute Entry, Apr. 2, 2025. On May 9, 2025, the parties submitted, in one filing, Joint Proposed Findings of Fact, Joint Proposed Conclusions of Law, Plaintiff's Conclusions of Law, and Defendants' Conclusions of Law. Dkt. 67 ("Proposals"). The bench trial took place on May 29, 2025.

## II. Bench Trial Standards

"In an action tried on the facts without a jury," a district judge "must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "It is within the province of the district court as the trier of fact to decide whose testimony should be credited." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012). Accordingly, the Court below sets forth its findings of fact, *infra* III, followed by its conclusions of law, *infra* IV.

## III. Findings of Fact

Srour and his longtime friend and employee, Steve Kachtan, testified at trial. Srour also offered five exhibits into evidence. Exhibit 1 is a letter entitled "Notice of Disapproval After Appeal" and dated November 7, 2019. Exhibit 2 is an invoice dated December 2, 2019, from a company called Tech Solutions. Exhibit 3 is three redacted pages from a PayPal Transaction

4

History showing payments made on November 11, 2019, May 25, 2020, and May 29, 2020, and a "[p]ending" payment dated February 26, 2021.  Exhibit 4 is a photograph of a dog, whom Srour identified as his Belgian Malinois named Kobe, and a man, whom Srour identified as a guard-dog trainer named Igor.  Tr. at 23:20-24:2.  Exhibit 5 is a screenshot from an NYPD License Division web portal indicating the statuses of a "Concealed Carry" application, two "Premise Residence" applications, and two "Rifle/Shotgun" applications.  The City did not call any witnesses or introduce any evidence at trial.

After observing the witnesses' testimony at trial, including their demeanors and responses to questioning, and considering that testimony in context with the exhibits received in evidence, the Court finds that Srour and Kachtan testified credibly.  Because many material facts are undisputed, the Court makes express factual determinations only as necessary to resolve relevant disputes and otherwise draws its findings from unrefuted testimonial or documentary evidence.

Srour lives in the Mill Basin neighborhood of Brooklyn with his wife and three children. *Id.* at 3:14-18.  Violence in Brooklyn and threats against Jews prompted Srour, an Israeli-born Jew, to apply for licenses to keep handguns, rifles, and shotguns in his home.  *Id.* at 4:13, 5:21-6:10, 8:14-19.  In 2018, Srour submitted applications to the NYPD for a handgun license and a rifle and shotgun permit.  *Id.* at 36:20-37:9.  The City denied those applications in May 2019 and June 2019, respectively, and, in November 2019, it denied his appeal of both decisions.  *Id.* at 9:7-16; Exhs. 1 ("Notice of Disapproval"), 5 ("Application Portal").  Srour testified credibly that he "was heartbroken" when his appeal was denied, explaining that, at the time, there were "a lot of riots," "a lot of houses [were] getting robbed," and he "was scared for [his] family."  Tr. at 11:7-10, 12:4-5.

Barred from possessing firearms, Srour "[i]mmediately" looked for other ways to secure his home. *Id.* at 14:20-25. After consulting his wife and friends, including Kachtan, Srour determined that a home security system would provide the best alternative. *Id.* at 14:23-15:2, 15:9-11. Though Srour felt "having a gun in the house is the most effective way" to protect the home, his wife "just wanted to have the house secured somehow." *Id.* at 15:13-16. Srour solicited quotes from several companies and settled on the lowest-cost option. *Id.* at 13:5-15, 52:14-16. Less than a month after the City denied his appeal in November 2019, Srour purchased cameras, an alarm system, and an intercom system for $33,751.25 (including an 8.875-percent sales tax), plus alarm monitoring for a fee of $500 per year. *Id.* at 14:14-19, 34:15-19; Exh. 2 ("Tech Solutions Invoice").[3] He also installed automatic flood lights at the side and back of the house. Tr. at 12:19-21.

For further protection, Srour bought a Belgian Malinois whom he named Kobe from a guard-dog breeder in Florida. *Id.* at 16:9-17. On November 11, 2019, Srour sent a $500 deposit to the breeder via PayPal. *Id.* at 17:12-13; Exh. 3 ("PayPal Statement") at 1. He paid the breeder in two more tranches: $2,000 via PayPal, Tr. at 19:24-20:2; PayPal Statement at 2, and $1,000 in cash upon pickup, Tr. at 45:2-10, 50:16-19. Srour also paid $75 via PayPal for Kobe's crate. *Id.* at 17:17-18; PayPal Statement at 2. The Court credits Srour's testimony that he would not have purchased either the security system or Kobe had he been permitted to possess firearms. Tr. at 51:18-22.

---

[3] The Tech Solutions Invoice reflects that Srour additionally purchased ten Yamaha speakers and five Sonos Amp amplifiers. Srour acknowledged at trial that these were unrelated to his security system, Tr. at 34:21-24; 43:3-5, and his counsel confirmed that he does not seek damages for their cost of $7,500, *id.* at 71:17-25.

Srour spent $17,300 to train Kobe in guard-dog duties. *See id.* at 20:20-21:3 (describing purposes of training as "bite work specifically, and attack, and guarding the house"). Kobe underwent several training regimens. First, in approximately February 2021, Srour sent Kobe for one week of training with a company called Integrity K9 Training, which cost $700. *Id.* at 20:6-17, 21:10-22:4; PayPal Statement at 3. Then Srour hired a trainer named Igor to work with Kobe for two-hour sessions every Sunday at a rate of $300 per session for approximately one year. Tr. at 22:5-19, 34:5-10; *see* Exh. 4 (photograph of Kobe and Igor).[4] Igor taught Kobe to attack intruders, Tr. at 22:20-25, and trained Kobe to alert upon hearing unnatural sounds, *id.* at 23:15-17. Srour himself received training from Igor on commanding Kobe to attack, sit, stay, release, and heel. *Id.* at 23:3-14. Kobe worked with a third trainer, Mike, for ten-to-fifteen one-hour sessions at a $100-per-hour rate. *Id.* at 34:11-12.[5] Other than the $700 paid to Integrity K9 Training, Srour's payments to the trainers, as well as the final $1,000 tranche to the dog breeder, are not supported by documentary evidence. Nevertheless, the Court credits Srour's testimony that he paid the trainers on these occasions in cash from proceeds he obtained through his business. *See id.* at 50:20-25, 66:4-15.

After the City denied his appeals in November 2019, *see* Notice of Disapproval, Srour felt anxious and suffered many "sleepless nights" out of concern for his family's safety. Tr. at 11:14-

---

[4] Though Srour's counsel stated that the training with Igor lasted one year, her demand for $31,200 for Igor's fees would reflect two years of weekly training sessions at a rate of $300 per session. Tr. at 72:6-9. The Court construes that as an arithmetic error given that Srour credibly testified that Igor and Kobe worked together for one year. *See id.* at 34:5-10 ("Q. Igor was every Sunday for two hours? A. For two hours . . . . Q. For a year? A. Yes."), 44:13-17 ("It was approximately a year, every Sunday religiously."), 22:8-11 ("Q. How often would you train with Igor? A. Every Sunday. Q. How long would the training sessions be? A. For over a year."). Moreover, statements by Srour's counsel of course are not evidence.

[5] Given Srour's recollection that there were ten-to-fifteen training sessions with Mike, the Court finds, by a preponderance of the evidence, that Mike worked with Kobe for ten sessions, at a total cost of $1,000.

19, 40:19-21.  His marriage suffered, given that his wife wanted him to have a gun.  *Id.* at 11:14-16, 11:23.  So did his business.  *Id.* at 11:23.  Kachtan, who is the chief information officer of the company that Srour owns and runs, *id.* at 61:7, testified that the denial distracted Srour from his job, *id.* at 60:5-9, that Srour appeared to be "distraught" and "upset" after the denial, *id.* at 59:4, and that Srour's sleeplessness was apparent at work, *id.* at 59:25-60:3.  Kachtan also said that Srour appeared to be "frightened" and would keep the security-camera footage from his home "up around the clock" while at his office.  *Id.* at 60:10-15.  According to Kachtan, Srour continued in that general state until he eventually received approval to possess firearms in 2024.  *Id.* at 62:3-7.

Srour testified that, while his condition improved approximately a year after the denial with the installation of the security system and a trained guard dog on the premises, he nevertheless continued to feel anxious and lose sleep.  *Id.* at 24:23-25:13.  Srour explained that his distress worsened after October 7, 2023, when threats to Jews in New York increased.  *Id.* at 25:20-26:4; *see id.* at 63:25 (Kachtan testifying that Srour "became more nervous" in that period).  Srour testified that groups of six or more people would enter his predominantly Jewish neighborhood and pass by his home wearing *keffiyehs*, *id.* at 27:1-9, chanting "Kill the Jews, Free Palestine," *id.* at 26:13, and ripping down Israeli flags, *id.* at 26:21-22.

After Srour reapplied for firearms licenses in October 2023, the City reversed itself and, in March 2024, granted his applications.  *Id.* at 31:4-9; Application Portal (showing that applications for Concealed Carry, Premise Residence, and Rifle/Shotgun were approved on March 21, 2024).  Srour was elated and relieved.  Tr. at 30:19-22 (Srour describing his celebration).  "Immediately" upon obtaining the licenses, Srour purchased a shotgun and handgun and sent the necessary paperwork to the NYPD License Division for further approval.  *Id.* at 31:20-32:8.  He was finally able to take the firearms home in late 2024.  *Id.* at 32:14-16.  Srour testified that, since then, his

8

sleep has improved.  *Id.* at 32:17-18, 48:5-7; *see id.* at 61:10-19 (Kachtan explaining that Srour's demeanor improved "when he got his permit" and "firearms ID card").

### IV.  Conclusions of Law

Srour seeks three sets of damages: compensatory damages for financial harm and emotional distress caused by the City's deprivation of his Second Amendment right, separate compensatory damages for the deprivation itself, and nominal damages.  Proposals at 6-8; Dkt. 67-1 (Proposed Pre-Trial Order) at 6; Compl. at 33 (Prayer for Relief seeking "an award of presumed compensatory damages in at least a nominal amount for the constitutional violations incurred by [Srour]").  For the reasons below, the Court awards Srour the first set of damages and declines to award the other categories.  In reaching that determination, the analysis proceeds as follows.  First, the Court considers and rejects the City's contention that Srour's recovery is limited to nominal damages as a matter of law.  Second, the Court reviews the applicable law for Section 1983 damages.  *See infra* IV.A.  Third, the Court concludes that financial and emotional harms are compensable injuries for a Section 1983 claim enforcing the Second Amendment.  *See infra* IV.B.1.  Fourth, the Court analyzes the evidence of Srour's injuries and quantifies his damages. *See infra* IV.B.2.

As a threshold matter, the City argues that Srour may recover only nominal damages. Proposals at 9-10.  The City reasons that, because Srour prevailed on a facial challenge but not an as-applied challenge, Srour cannot prove that he was injured by the City's unconstitutional laws and regulations.  *Id.*  The Court disagrees.

First, the City cites only authorities that stand for the uncontroversial position that nominal damages are available to plaintiffs who cannot show an actual injury.  *See id.*  Fair enough.  But these cases do not support the proposition that the City urges this Court to adopt: a successful facial

challenge without a companion as-applied challenge necessarily means the plaintiff was not injured.

Second, the City's argument fails as a matter of logic. The Court resolved liability when it granted summary judgment in Srour's favor on the ground that certain provisions of the City's ordinances violated the Constitution in *all* their applications by affording City officials unconstitutionally broad discretion to deny applicants their Second Amendment rights. *See Srour*, 699 F. Supp. 3d at 284-85. The City's denials of Srour's firearms applications pursuant to those very provisions necessarily were among those applications. *See id.* at 263-64, 284-85; *cf. Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006) (explaining that facial and as-applied challenges differ only in "*the extent to which* the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application)"), *overruled on other grounds by*, *Bond v. United States*, 564 U.S. 211, 216 (2011). The questions at this stage are whether Srour's actual injuries are compensable under Section 1983, whether those injuries were caused by the City's unconstitutional conduct, and, if so, their amount.

And third, while the City fails to put forward any authority in its favor, there is some support for declining to adopt a categorical rule that plaintiffs cannot seek damages based solely on facial challenges. *Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, N.Y.*, No. 19 Civ. 443 (KMK), 2021 WL 1226930, at *11-14 (S.D.N.Y. Mar. 31, 2021) (declining to adopt a categorical rule "that plaintiffs generally cannot seek damages based upon a facial challenge alone," but dismissing certain claims for damages as unripe).

The Court thus proceeds to Srour's demand for compensatory damages.

A.    **Section 1983 Damages Generally**

The "basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254 (1978); *see Kerman v. City of New York*, 374 F.3d 93, 123 (2d Cir. 2004) (stating that Section 1983 incorporates the "cardinal principle of damages in Anglo-American law," which is "*compensation for the injury caused to plaintiff by defendant's breach of duty*" (quoting *Carey*, 435 U.S. at 254-55)); *cf. Memphis Cmt'y Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) ("Deterrence is also an important purpose of this system, but it operates through the mechanism of damages that are *compensatory*—damages grounded in determinations of plaintiffs' actual losses."). The parties do not cite, and the Court is not aware of, any court that has considered compensatory damages for a Section 1983 claim based on a Second Amendment violation. So the Court turns to general principles of damages for constitutional torts to identify the method for evaluating whether Srour is entitled to that relief.

Section 1983 created a "'species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities'" that the Constitution secures. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) (quoting *Carey*, 435 at 253); *see City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 728 (1999) (Scalia, J., concurring in part and concurring in the judgment) (calling a Section 1983 claim a "personal-injury tort"). To "defin[e] the contours and prerequisites of a § 1983 claim," courts generally look for analogs in the common law of torts. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 370 (2017). When the common law of torts protects "interests . . . [that] parallel closely the interests protected by a particular constitutional right . . . , it may be appropriate to apply the tort rules of damages directly to the § 1983 action." *Carey*, 435 U.S. at 258. This commonly occurs when Section 1983 claims arise under the Fourth Amendment.

11

*See, e.g.*, *Russo v. City of Bridgeport*, 479 F.3d 196, 203-04 (2d Cir. 2007) (analyzing Section 1983 claims of false arrest and false imprisonment under the common law of the state where the tortious conduct occurred). At the same time, the Supreme Court has recognized that the common law's guidance is limited for constitutional rights that lack common-law analogs, such as those found in the First and Fourteenth Amendments. In such cases, courts must not allow "the deprivation of constitutional rights" to go "uncompensated simply because the common law does not recognize an analogous cause of action." *Carey*, 435 U.S. at 258. So they must "adapt[] common-law rules of damages to provide fair compensation for injuries caused by [that] deprivation." *Id.* (calling this a task of "some delicacy").

No matter the right in question, a Section 1983 plaintiff must prove injury and causation to warrant compensatory damages. An "actual injury" may include out-of-pocket expenses, mental anguish, and emotional distress. *Stachura*, 477 U.S. at 307. By contrast, "the abstract value of a constitutional right may not form the basis for § 1983 damages." *Id.* at 308. A plaintiff also must prove that the deprivation of his constitutional right proximately caused that actual injury. *See Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999). "[T]ort defendants, including those sued under § 1983, are responsible for the natural consequences of their actions." *Warner v. Orange Cnty. Dep't of Probation*, 115 F.3d 1068, 1071 (2d Cir. 1996) (citation modified) (stating that "[t]he Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983" (citation modified)). A plaintiff who cannot prove both causation and an actual injury can recover only nominal damages for a constitutional violation. *See Stachura*, 477 U.S. at 308 n.11; *Warren v. Pataki*, 823 F.3d 125, 141 (2d Cir. 2016).

12

A plaintiff's injuries must match the interests that the underlying constitutional right protects, because compensatory damages are "available only for risks that are constitutionally relevant." *Townes*, 176 F.3d at 148 (citation modified); *see Carey*, 435 U.S. at 264-65 (explaining that "the elements and prerequisites for recovery of damages . . . must be considered with reference to the nature of the interests protected by the particular constitutional right in question"). *Townes* illustrates this principle in the context of the Fourth Amendment, which has a common-law analog. 176 F.3d at 147-48. There, the Second Circuit held that a plaintiff who alleges an unconstitutional search and seizure cannot recover damages based on his subsequent conviction and incarceration. *Id.* at 148. The "constitutionally relevant" risk that the Fourth Amendment mitigates is not criminal conviction but the invasion of privacy, so "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy" only. *Id.* In *Townes*, damages for the plaintiff's conviction and detention did not "fit" the constitutional right that was infringed—freedom from invasion of privacy—so compensatory damages for those injuries would not serve any "Fourth Amendment value" and were therefore unavailable. *Id.*

This matching is arguably more important where, as here, the constitutional right underlying the Section 1983 claim does not have a common-law analog. For example, the First Amendment protects, *inter alia*, political assembly and speech, so compensable injuries for its deprivations include "the loss of an opportunity to demonstrate" and interference with a person's attendance at a meeting. *Hobson v. Wilson*, 737 F.2d 1, 62 (D.C. Cir. 1984) (cited with approval in *Stachura*, 477 U.S. at 309); *see also Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649-50 (2d Cir. 1998) (collecting cases illustrating First Amendment injuries). The Fourteenth Amendment protects, *inter alia*, procedural due process, so plaintiffs may recover compensatory damages for injuries resulting from the "receipt of deficient process." *Warren*, 823 F.3d at 143

13

(citing *Poventud v. City of New York*, 750 F.3d 121, 135-36 (2d Cir. 2014) (en banc)).  But courts must be careful in such cases to award damages only for injuries attributable to the denial of due process itself, as opposed to the deprivation for which the plaintiff claims to be entitled to due process.  *See id.*[6]  Only the former matches the interest in sufficient process that the Fourteenth Amendment protects.

Based on the foregoing, the steps for analyzing whether to award compensatory damages for a Section 1983 claim that enforces a constitutional right are: determine whether there is a common-law analog for the claimed injury; match the plaintiff's actual injuries to the interests that the constitutional right protects; and finally, evaluate whether the plaintiff's actual injuries were caused by the deprivation.

**B.      Compensatory Damages for Financial Harm and Emotional Distress**

The Second Amendment, which applies to states and municipalities through the Fourteenth Amendment, protects citizens' interest in securing themselves and their families, especially in their homes.  *See McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008).  Srour incurred significant expenses and suffered emotional distress as a result of the City's denial of his constitutional right to possess firearms for that lawful purpose.

---

[6] This illustration suggests an overlap between the inquiry into what interests the constitutional right protects and the proximate-cause analysis.  The Second Circuit in *Townes*, however, made clear that these remain distinct requirements for a Section 1983 plaintiff's recovery of compensatory damages.  176 F.3d at 146-47 (barring a damages claim for a lack of proximate causation and for the "second, independent reason" that the plaintiff's injury "does not fit the damages he seeks").  In effect, both examine whether the plaintiff's injury "result[ed] from activities within the zone of interests that § 1983 protects."  *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 279 (2016) (Thomas, J., dissenting) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 n.5 (2014)).

**1.    Srour's Injuries Fit the Interests That the Second Amendment Protects.**

Neither party points the Court to any analog in common-law tort law for Srour's unlawful disarmament.  So the Court must consider whether Srour's injuries "fit" the interests that the Second Amendment protects.  *Townes*, 176 F.3d at 148 (stating that the plaintiff's injury must fit the "evil" the constitutional right aims to avoid); *see Carey*, 435 U.S. at 264-65 (instructing courts to consider "the elements and prerequisites for recovery of damages . . . with reference to the nature of the interests protected by the particular constitutional right in question"); *see also Manuel*, 580 U.S. at 370 ("In applying, selecting among, or adjusting common-law approaches, courts must closely attend to the values and purposes of the constitutional right at issue.").

The Second Amendment "confer[s] an individual right to keep and bear arms."  *Heller*, 554 U.S. at 595; *see Bruen*, 597 U.S. at 37 (clarifying that the right's scope as to the states and federal government is the same).  And "the *central component*" of that right is "individual self-defense."  *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599); *accord Heller*, 554 U.S. at 592 (explaining that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation").  Nowhere is this right more significant than in one's home, "where the need for defense of self, family, and property is most acute."  *Heller*, 554 U.S. at 628.[7]

Srour's injuries are consistent with those interests.  The City unlawfully denied his constitutionally-protected means of self-defense at home.  Barred from possessing a firearm for that lawful purpose, Srour felt compelled to spend money on other means of home defense and

---

[7] Of course, the Second Amendment right is not confined to the home.  *See Bruen*, 597 U.S. at 32.  Srour, however, seeks damages only for his inability to possess firearms in his home. *See* Tr. at 78:11-15; *cf. N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 357-58 (2020) (Alito, J., dissenting) (considering the availability of compensatory damages for unconstitutional restrictions on the transport of firearms).

suffered anxiety and sleeplessness from his feelings of insecurity—injuries that fit squarely within the Second Amendment's zone of interests.

> **2.      The Court Awards Srour Compensatory Damages for His Financial and Emotional Injuries.**

> **i.         Out-of-Pocket Injuries**

Given that firearms are "essential for self-defense," *McDonald*, 561 U.S. at 787, and especially in the home, *see Heller*, 554 U.S. at 628, it is natural and foreseeable that a citizen unlawfully denied the right to keep them in his home would explore other ways to secure himself and his family.  The Supreme Court has contemplated that citizens may incur financial harm for such out-of-pocket expenses when government officials violate their rights.  *See, e.g.*, *Stachura*, 477 U.S. at 307 (explaining that compensatory damages for Section 1983 liability "may include . . . out-of-pocket loss and other monetary harms").

Srour credibly testified that he would not have installed his home security system or purchased Kobe, his guard dog, had the City granted his firearms applications.  *See* Tr. at 41:22-42:3 (on cross-examination, Srour affirming that he would not have installed a home security system or bought a guard dog had he been permitted to have a firearm), 15:9-14 (Srour explaining that he spoke with his wife about installing the security system because she "just wanted to have the house secured somehow.  If it's not a gun, it's some other way."), 24:17-22 (on cross-examination, Srour stating that after his license applications were denied, "[t]here [was] no other way to protect myself . . . .  So there's . . . either get an alarm system, get an alarm system and a dog, and go from there.").  The promptness with which Srour moved to install a security system and buy a guard dog is also probative of causation.  *See id.* at 14:14-15:2 (Srour explaining that he made those purchases within one month of the denial of his appeals).  So is the fact that Srour's emotional condition improved after the security system was installed and the dog was at his home.

16

*Id.* at 25:6-13. That Srour maintained the security system and kept Kobe even after he was able to obtain firearms does not alter the conclusion that he initially incurred their costs because the City barred him from obtaining guns in 2019.[8]

The City makes four points in opposing Srour's demand for out-of-pocket damages. First, the Court should not award damages for any expense not supported by documents. Tr. at 74:23-25. Second, the home security system and guard dog were not bought "as a replacement for firearms in the home." *Id.* at 75:22-25. Third, Srour's testimony about fearing riots is not credible. *Id.* at 76:9-20. Fourth, Srour has not shown that he faced any specific threat. *Id.* at 76:21-25. The Court takes each in turn.

First, there is no requirement that Srour must submit documentary evidence of his financial injuries. As noted earlier, *see supra* III, the Court finds that Srour was credible in testifying that he paid cash when he purchased Kobe and paid the dog's trainers, and in explaining why he had sufficient cash on hand to make those payments. *Id.* at 45:2-10, 50:16-25, 65:24-66:15.

Second, the City is correct that the security system and Kobe are not direct substitutes for a firearm, and in some respects might provide even better security for Srour's home. For instance, a firearm could have served Srour's home defense needs only while he was home, whereas the security system operated around the clock and Kobe presumably was home and trained to guard the premises regardless of Srour's presence (though it is not clear from the record whether Kobe needed to receive a command before he would defend against an intruder, *see id.* at 22:20-23, 23:3-12). *See id.* at 41:10-20. But it is hornbook law that the victim of tortious conduct is "entitled to

---

[8] Of course, this does not mean that everyone denied a firearms license can recover compensatory damages for security arrangements that they made in the absence of a gun. A plaintiff seeking damages under Section 1983 based on a Second Amendment violation must prove that he suffered actual injuries that were proximately caused by unconstitutional state action, as Srour has done. *See Warner*, 115 F.3d at 1071.

recover for expenditures reasonably made . . . to avert the harm threatened." Restatement (Second) of Torts § 919(1) (2025); *see Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015) (citing Restatement (Second) of Torts §§ 903, 912 (1977) for "general tort principles"). Srour's expenditures were reasonable and sufficiently connected to the harm, or "evil," caused by the unconstitutional denial of his Second Amendment right. *Townes*, 176 F.3d at 148.

Third and fourth, the City has not explained why Srour would need to justify his expenses based on specific riots or threats. The Constitution does not require citizens to identify threats before obtaining firearms in pursuit of their "inherent right of self-defense" that is "central to the Second Amendment." *Heller*, 554 U.S. at 628. And regardless, Srour testified credibly that he was concerned about riots in his neighborhood, threats and intimidation specifically towards Jews, and home burglaries, both during and after the period when he applied for firearms licenses. Tr. at 11:9-12, 12:4-6, 25:20-26:22; *see supra* III.

The Court finds, by a preponderance of the evidence at trial, that Srour is entitled to an award of $56,626.25 in compensatory damages for his financial injuries. The evidence established that Srour spent (1) $33,751.25 on his home security system, Tr. at 14:14-19; Tech Solutions Invoice; (2) $2,000 on alarm-system monitoring reflecting an annual rate of $500 over the four years between installing that system and obtaining his firearms, Tr. at 34:15-19; Tech Solutions Invoice; (3) $3,575 on purchasing Kobe and Kobe's crate, Tr. at 17:17-18, 19:24-20:2, 45:2-10; PayPal Statement at 2; and (4) $17,300 to train Kobe which included one week with Integrity K9 Training ($700), Tr. at 20:6-17, 21:10-22:4; PayPal Statement at 3, one year with Igor ($15,600), Tr. at 22:5-19, 34:5-10, and ten sessions with Mike ($1,000), *id.* at 34:11-14.

18

###### ii.    Emotional Distress

Srour seeks an additional $125,000 for "garden-variety" emotional distress.  Proposals at 7-8; Tr. at 74:1-3.  Like his financial harms, this injury was caused by the City's deprivation of Srour's Second Amendment right.  It is natural and foreseeable that a law-abiding citizen denied a license to possess firearms for the lawful purpose of self-defense would feel insecure and anxious about his ability to defend himself and his family at home.

"It is well-established that courts may award emotional distress damages in section 1983 cases."  *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of New York ("Patrolmen's")*, 310 F.3d 43, 55 (2d Cir. 2002).  "The damage award 'must be supported by competent evidence concerning the injury.'"  *Id.* (quoting *Carey*, 435 U.S. at 264 n.20).  So plaintiffs who offer subjective testimony in support of their emotional distress claims generally must introduce additional evidence of their injuries, such as witness testimony.  *Patrolmen's*, 310 F.3d at 55-56 (noting that medical treatment and physical symptoms are not required).

"In this Circuit, emotional distress awards can generally be grouped into three categories of claims: garden-variety, significant, and egregious."  *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018).  These categories often appear in employment discrimination cases, *see, e.g.*, *Williams v. Firequench, Inc.*, No. 21 Civ. 4112 (PAE) (JLC), 2022 WL 3571752, at *8 (S.D.N.Y. Aug. 19, 2022), *report and recommendation adopted in part by*, 2023 WL 4681720 (S.D.N.Y. July 21, 2023), but courts have cited them as a framework also for Section 1983 purposes, *see e.g.*, *Razzano v. Cnty. of Nassau*, No. 07 Civ. 3983 (ADS) (AKT), 2012 WL 1004900, at *12 (E.D.N.Y. Feb. 27, 2012), *report and recommendation adopted by*, 2012 WL 1004898 (E.D.N.Y. Mar. 23, 2012); *Thorsen v. Cnty. of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010); *Jessamy v. Ehren*, 153 F. Supp. 2d 398, 401 (S.D.N.Y. 2001); *see also In re*

*Sims*, 534 F.3d 117, 141 (2d Cir. 2008) (holding that a Section 1983 plaintiff must be permitted to withhold privileged patient-psychotherapist communications where he does not claim any "non-garden-variety emotional distress"). That said, these general categories of emotional distress damages are more "guidelines" than "bright line rules." *Razzano*, 2012 WL 1004900, at *12 (explaining that "their utility is somewhat diminished by the fact that courts" disagree on "what the labels mean").

"Garden-variety" emotional distress claims are "simple or usual," *Jessamy*, 153 F. Supp. 2d at 401, do not require medical corroboration, and "generally merit $30,000 to $125,000 awards," *Quinby v. WestLB AG*, No. 04 Civ. 7406 (WHP), 2008 WL 3826695, at *3 (S.D.N.Y. Aug. 15, 2008). *See Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 330 (S.D.N.Y. 2016) (collecting cases). Courts have awarded $30,000 to plaintiffs who testified that they were "sad, anxious, and ashamed" after losing a job due to disability-based discrimination, *Yunganaula v. Garcia*, No. 19 Civ. 6247 (EK) (SJB), 2021 WL 5993622, at *18 (E.D.N.Y. Aug. 11, 2021), *report and recommendation adopted in part by*, 2021 WL 5984851 (E.D.N.Y. Dec. 17, 2021), who alleged "intense stress and anxiety" and "significant physical manifestations" resulting from employment discrimination based on race and sex, *Quintero v. Angels of the World, Inc.*, No. 19 Civ. 6126 (DG) (RLM), 2021 WL 4464123, at *15 (E.D.N.Y. Sept. 10, 2021), *report and recommendation adopted by*, 2021 WL 4463488 (E.D.N.Y. Sept. 29, 2021), and who suffered "anxiety, stress, shame and embarrassment, and loss of self-worth" resulting from employment discrimination based on race and national origin, *Santiago v. Crown Heights Ctr. for Nursing & Rehab.*, No. 15 Civ. 4381 (DLI) (CLP), 2017 WL 9482107, at *23 (E.D.N.Y. Feb. 24, 2017). *See Williams*, 2022 WL 3571752, at *8 (collecting cases). By contrast, cases near the top of the range typically concern ongoing distress that was "more intentional, physically harmful, and/or lasted

20

for a longer period of time." *Id.*; *see id.* at *8 n.13. For example, a plaintiff recovered $125,000 for "garden-variety" emotional distress where she "suffered multiple incidents of sexual harassment over a sustained period" and testified that she "felt ashamed and embarrassed, was afraid to be home alone," feared going out in public, lost sleep for weeks, and "panic[ked] when she felt somebody behind her." *Duarte*, 341 F. Supp. 3d at 321 (citation modified). And in 2010, a district court upheld a jury award of $200,000 for "garden-variety" emotional distress that arose out of multiple acts of First Amendment retaliation in a police department by its three highest ranking officials, noting that the evidence showed that the plaintiff "was distressed over a long period of time, [and] that the distress affected his lifestyle and personality." *Wallace v. Suffolk Cnty. Police Dep't*, No. 04 Civ. 2599 (RRM), 2010 WL 3835882, at *10 (E.D.N.Y. Sept. 24, 2010). In doing so, the court noted that inflation "would support higher awards in future cases." *Id.* (citing *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 77-78 (2d Cir. 2004)).

Damages arising from violations of the First and Fourteenth Amendments are also instructive. The Second Circuit has affirmed a judgment awarding $12,500 for emotional distress resulting from a deprivation of procedural due process, *Miner v. City of Glens Falls*, 999 F.2d 655, 659, 662-63 (2d Cir. 1993), and a jury award of $50,000 for emotional distress caused by a deprivation of equal protection, *Patrolmen's*, 310 F.3d at 56. *See also id.* (collecting cases showing a wide range of awards for emotional distress in civil rights cases). In *Razzano*, the district court awarded the plaintiff $20,000 after the police held onto his rifles and shotguns for approximately four years without due process, causing the plaintiff to withdraw from his personal relationships, lose his social and creative drive, and suffer from humiliation, headaches, and sleeplessness (although the court did not credit the plaintiff's testimony that his sleeplessness and nightmares lasted four years). 2012 WL 1004900, at *2, *9-13 (emphasizing that the award was for the

21

emotional distress owed only to the county's retention of the firearms without due process, not to their seizure, and that witnesses corroborated the plaintiff's testimony about his emotional distress). In *Anello v. Anderson*, a First Amendment case, the plaintiff recovered $20,000 ($10,000 per defendant) in damages for emotional distress and harm to his reputation when members of the city council infringed his right to speak at the open-floor portion of a hearing and wrongfully caused a police officer to remove him from the chamber. 191 F. Supp. 3d 262, 270-71, 278 (W.D.N.Y. 2016). The plaintiff testified that he felt "embarrassed, abused, bad, terrible, degraded, humiliated, and like scum" and became "introverted, unmotivated, and depressed" after the incident. *Id.* at 277.

Based on the evidence presented at trial, the Court concludes by a preponderance of the evidence that an award of $20,000 is appropriate to compensate Srour for his emotional distress. Srour does not claim to have suffered the debilitating anxiety and stress that would justify an award in the vicinity of $125,000. In contrast to the plaintiffs with awards at that higher end of the spectrum, Srour did not present evidence that his sleeplessness and anxiety impaired his ability to function at work, go out in public, or enjoy leisure time. *See Williams*, 2022 WL 3571752, at *8; *Duarte*, 341 F. Supp. 3d at 321; *Wallace*, 2010 WL 3835882, at *10. Indeed, Srour's emotional distress most resembles that of the plaintiffs in *Razzano* and *Anello*, albeit somewhat less severe. Srour testified that his sleeplessness lasted a little over one year, and his anxiety persisted even longer. Tr. at 24:23-25:13. But he did not testify that he was embarrassed or lost any motivation like the plaintiffs in *Razzano* and *Anello*. Moreover, the Court hesitates to attribute all of Srour's emotional distress to the City's deprivation of his Second Amendment right. *See Razzano*, 2012 WL 1004900, at *13. On one hand, his sleep improvement after installing a home security system and having a guard dog on the premises suggests that the Second Amendment deprivation caused

22

his initial emotional deterioration.  Yet, on the other hand, even if Srour had been able to keep a gun at home during the period of his disarmament, that weapon likely would not have been useful to him to secure his home and protect his family while he was at work.  So any anxiety he felt while at his office and otherwise away from home cannot be fairly traced to the City's unconstitutional action.  In light of the awards in *Razzano* and *Anello,* and considering "the passage of time since the cited cases," *Meacham*, 381 F.3d at 78; *accord Wallace*, 2010 WL 3835882, at *10, the Court awards Srour $20,000 in compensatory damages for emotional distress.

* * *

Srour cannot recover any other damages.  Nominal damages are unavailable because Srour suffered actual injuries and is being compensated for them.  *See Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir. 1998) ("A § 1983 plaintiff is entitled to nominal damages only in the absence of proof of actual injury.").  Neither does the deprivation of his rights itself give rise to compensatory damages that are separate from those he will recover for his actual injuries.

Srour misreads the Second Circuit's decision in *Kerman* in arguing that damages from the City's deprivation of his constitutional rights are "separable" from the damages due to his actual injuries.  Proposals at 6-7 (quoting *Kerman*, 374 F.3d at 125).  In *Kerman*, a plaintiff proved at trial that, *inter alia*, he was unlawfully detained in violation of the Fourth Amendment.  374 F.3d at 106.  The jury did not credit his testimony about mental and emotional distress, and awarded him nominal damages only.  *Id.* at 106, 123.  On appeal, the Second Circuit remanded for a new trial on damages because it held that a Section 1983 plaintiff who proves that he was subjected to an unlawful seizure is entitled as a matter of law to compensatory damages.  *Id.* at 124.  The key point of analysis that Srour overlooks is that the Second Circuit compared the constitutional tort that the plaintiff suffered to the common-law tort of false imprisonment, where the "tort is

23

complete with even a brief restraint of the plaintiff's freedom" and without further injury. *Id.* at 125 (citation modified). Because the "loss of liberty" injury inheres in the commission of the tort, the law entitles a victim of false imprisonment to compensation. *Id.* Given the analog, the Second Circuit imported that rule of common-law torts into the realm of constitutional torts and held that damages for loss of liberty are "separable" from damages for injuries like physical harm and emotional distress. *Id.* Srour does not provide any basis for extending that rule outside the Fourth Amendment context, especially in the absence of a common-law analog to the deprivation of his Second Amendment right. *See Carey*, 435 U.S. at 264-65 (explaining that a given injury may be compensable for the deprivation of one constitutional right but not the deprivation of another).[9]

Additional considerations further undermine Srour's position. Treating the deprivation of the Second Amendment right as an injury distinct from Srour's actual injuries would find tension with the Supreme Court's admonition not to award damages for a right's "abstract value." *Stachura*, 477 U.S. at 308; *see Hobson*, 737 F.2d at 62 ("[I]ntangible interests must be compensated if they can be conceptualized and if harm can be shown with sufficient certainty to avoid damages based either on pure speculation or the so-called inherent value of the rights violated."). In the absence of a common-law analog showing that the deprivation is an injury in

---

[9] Srour also cites two First Amendment free-exercise cases where damages were awarded for the denial of a religious meal while in prison, *Ford v. McGinnis*, 198 F. Supp. 2d 363, 366 (S.D.N.Y. 2001), and for violations of inmates' rights to exercise their religion in prison, *Bryant v. McGinnis*, 463 F. Supp. 373, 388 (W.D.N.Y. 1978). Proposals at 7. These decisions are inapposite. First, those cases concern the First Amendment and, as noted above, the damages framework "appropriate to compensate injuries caused by the deprivation of one constitutional right [is] not necessarily appropriate to compensate injuries caused by the deprivation of another." *Warren*, 823 F.3d at 143 (citation modified). Second, it is not clear that *Bryant* can be squared with *Stachura*, which was decided nine years later. *Stachura*, 477 U.S. at 311-12. Third, *Ford* awarded damages for a violation of the plaintiff's First Amendment rights *per se* but "*not* for any emotional or mental injury resulting from such violation," 198 F. Supp. 2d at 366, so the court did not need to weigh the risk of double recovery.

24

and of itself (as with the loss of liberty), awarding these damages also risks double recovery. *See Restivo v. Hessemann*, 846 F.3d 547, 593 (2d Cir. 2017) (Livingston, J., concurring in part and dissenting in part) (stating that "our precedent is clear that the common law rule against double recovery is applicable in the section 1983 context"). Finally, to the extent Srour is advocating for presumed damages for the deprivation, those are unavailable because "[p]resumed damages are a *substitute* for ordinary compensatory damages," and "no rough substitute for compensatory damages [is] required" where the plaintiff can be compensated "for both monetary and nonmonetary harms caused by [the defendant's] conduct." *Stachura*, 477 U.S. at 311-12. And as just explained, the Court awards Srour compensatory damages for his financial harm and emotional distress. The Court thus does not award Srour further compensatory damages based on the constitutional deprivation itself.

## V.  Conclusion

For the foregoing reasons, the Court awards Srour $76,626.25 in compensatory damages for the financial harm and emotional distress he suffered as a result of the City's denial of his constitutional right to possess firearms for lawful purposes. As explained above, the Court awards $56,626.25 for Srour's financial injuries and $20,000 for his emotional distress.

Within two weeks of these Findings of Fact and Conclusions of Law, Srour shall submit a letter in support of his demand for reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b), *see* Compl. at 33, including fee statements and resumes or other descriptions of the qualifications of the attorneys and paralegals who worked on this case.  In that letter, Srour shall also advise whether he seeks prejudgment interest, and if so, on what grounds and at what rate.  *See Gierlinger v. Gleason*, 160 F.3d 858, 873-75 (2d Cir. 1998).  The City's response, if any, shall be filed no later than two weeks after Srour's submission.

　　　　SO ORDERED.

Dated: March 30, 2026
　　　　New York, New York

　　　　　　　　　　　　　　JOHN P. CRONAN
　　　　　　　　　　　　　　United States District Judge

26